HOWARD R. WARD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROSSFORD TERMINAL WAREHOUSE, INC. (FORMERLY THE VOICE OF THE MAUMEE VALLEY, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 440-65—443-65. Filed September 6, 1967.

*H. Guy Hardy* and *W. Dean Hopkins*, for the petitioners.
*Donald H. Richards* and *John P. Graham*, for the respondent.

MULRONEY, *Judge:* In docket Nos. 440–65 and 441–65 respondent determined deficiencies in the 1961 income tax of petitioners Howard R. Ward and Rossford Terminal Warehouse, Inc., in the amounts of $216,656.49 and $145,685.49, respectively (plus negligence penalties which respondent has waived). In docket No. 442–65 and docket No. 443–65 respondent determined transferee liability against the Rossford Terminal Warehouse, Inc., in the amounts of $227,489.31 and $47,097.91, respectively.

After various concessions by the parties, the remaining questions in these consolidated cases are whether Ward realized capital gain of $170,000 or some other amount by the 1961 assignment of Ward's radio station license that was in his name to the predecessor corporation of Rossford Terminal Warehouse, Inc., and the simultaneous assignment of the license by the corporation to a bona fide purchaser; and also whether this transfer renders the said corporation a transferee within the meaning of section 6901, I.R.C. 1954.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

Petitioner Howard R. Ward lives in Bowling Green, Ohio, and he filed his 1961 income tax return with the district director of internal revenue, Cleveland, Ohio. Petitioner Rossford Terminal Warehouse, Inc., will be referred to as the corporation. It was formerly named the Voice of the Maumee Valley, Inc., and it is an Ohio corporation located in Bowling Green. It filed its return on a November 30 fiscal year basis and its return for the period ended November 30, 1961, was filed with the district director of internal revenue in Cleveland.

Prior to November of 1955, Ward individually owned a 250-watt radio station in Bowling Green, which he operated under a license

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

granted to him by the Federal Communications Commission. It is stipulated that the radio station here involved at various times during the period 1955 through 1961 used the following call letters: WWBG, WTLG, WHRW. In late November of 1955, Ward caused the petitioner corporation to be incorporated under Ohio law, and he transferred all of the assets used by him in the operation of the radio station to the corporation for all of its stock. The stated value of the stock given to him was $150,000. The necessary documents were filed with the State of Ohio and the exchange of assets for $150,000 worth of stock was approved by the Ohio State Securities Commission after an appraisal was made by an appraiser who included the value of the license in his valuation. In connection with this transfer Ward executed and delivered to the corporation a document entitled "Bill of Sale and Assignment," which states as follows:

KNOW ALL MEN BY THESE PRESENTS: That I, Howard R. Ward, in consideration of One ($1.00) Dollar and other valuable consideration to me in hand paid by The Voice of the Maumee Valley, Inc., an Ohio corporation, do hereby Sell, Assign, Transfer and Set Over to the foregoing corporation of all of my right, title and interest in and to any and all property, tangible and intangible, which I may own or in which I have any interest whatsoever, which has been used by me and is used at the present time in connection with the operation of Radio Station WWBG at Dirlam Road, R.F.D., Bowling Green, Ohio.

For the aforesaid consideration I further Sell, Assign and Transfer to the aforesaid corporation any and all licenses which have heretofore been issued to me, to the extent that such licenses are assignable, and to the extent that such assignment shall not jeopardize the operation of Radio Station WWBG.

As a part of the consideration for the aforesaid sale and assignment, it is the undersign's [sic] understanding that he shall receive certain shares of stock issued by The Voice of the Maumee Valley, Inc., and that the issuance of the aforesaid stock to the undersigned constitutes sole consideration for this sale and assignment.

After the above transfer of the broadcasting station to the corporation was completed the corporation, beginning in early December 1955, continued to operate the station the same as Ward had operated it using the same frequency and with the same call letters that Ward had used. In January 1956, Ward wrote a letter to the FCC asking for "the necessary forms required to request that the license granted in the name of Howard R. Ward be transferred to a corporation." Any forms that might have been sent to him in response to this letter were not immediately completed. Certain situations developed involving an offer to purchase by one using the same frequency and operating an AM station and this resulted in Ward's, in order to protect the station license, filing an application with the FCC for increased power on the last day for such filing. After several amendments the application was granted in June of 1961. During all of this period the corporation continued to operate the station but the FCC license stood in Ward's name.

In 1960 Ward entered into negotiations for the sale of the broadcasting station and on September 6, 1960, an agreement was entered into by the corporation and Ward for the sale of all of the radio station assets to the Memorial Foundation or its nominee for $200,000 which provided, in part, in the preamble portion, as follows:

### AGREEMENT TO SELL ASSETS OF STATION WHRW

THIS AGREEMENT, entered into between HOWARD R. WARD, and VOICE OF THE MAUMEE VALLEY, INC., an Ohio corporation, collectively referred to as "SELLERS", and THE MEMORIAL FOUNDATION, an Ohio non-profit corporation, referred to as "BUYER";

WITNESSETH THAT:

WHEREAS, Howard R. Ward is the individual licensee of Station WHRW which is licensed to operate on the frequency of 730 kilocycles with a power of 250 watts, daytime hours, in Bowling Green; and

WHEREAS, Howard R. Ward holds a construction permit (File No. BP–10,884, as modified) issued by the Commission authorizing Station WHRW to change power to 1 kilowatt, utilizing a directional antenna, while continuing to operate on 730 kilocycles, daytime hours only; and

WHEREAS, Sellers own all of the assets used in the operation of standard broadcast radio station known as WHRW * * *; and

WHEREAS, Sellers desire to sell and Buyer desires to purchase all of the assets of Sellers used in connection with the operation of such Station, except as hereinafter provided; and

WHEREAS, Howard R. Ward desires to assign and Buyer desires to acquire, subject to the consent of the Commission, the license and construction permit, and all rights to operate the Station;

NOW THEREFORE, in consideration of the purchase price hereinafter set forth and of the other terms of this agreement, it is agreed as follows:

In section 1, the agreement goes on to recite that seller agrees to convey "on the Closing Date" all of the physical assets of the station, and the contracts for radio time, and assign the interest of the lessees in leased premises. Section 2 of the agreement provides as follows:

§ 2—It is contemplated by the parties hereto that promptly after the execution of this agreement, THE MEMORIAL FOUNDATION will cause an Ohio corporation to be organized under the name of WHRW, INC., a majority of the stock of which shall be issued to The Memorial Foundation, which will assign to WHRW, INC. all of The Memorial Foundation's rights under this contract and upon such assignment, such new corporation shall be considered for all purposes as the Buyer hereunder, and as used herein, Buyer shall refer to such new corporation; provided, however, that such assignment shall not relieve The Memorial Foundation of its obligation to Seller for payment of the first FIFTY THOUSAND 00/100 DOLLARS ($50,000) of the purchase price, of which amount The Memorial Foundation guarantees payment. Sellers consent to the use by such new corporation of the name WHRW, INC. and will supply such formal consent as may be required by the Secretary of the State of Ohio.

In section 3 it is provided that the consideration to be paid by the buyer is to be $200,000 of which $165,000 is to be represented by an installment note payable to the corporation and Ward, secured by all of the stock of WHRW, Inc., which is to be placed in escrow under

an escrow agreement where default in paying the note would result in title to the stock being transferred to the holder of the note or some purchaser at public sale. The agreement provides in section 6 that the agreement is subject to the written approval of the FCC and the parties agree they will all join in any pertinent application to the FCC and take all reasonable steps to secure the consent of the Commission. Section 11 of the agreement provides as follows:

§ 11—Closing Date as used herein shall be a date not later than five (5) days after the Federal Communications Commission's order approving and consenting to the transfer of the license of such Station to the Buyer has become final. The order of the Commission shall be deemed final when it becomes an order with respect to which no further action can be taken by any proceeding to protest, review, or set aside such order. Buyer shall give notice to the Sellers of the precise time for Closing Date, which shall be held at the studios of the Station at 9 A.M. on said date unless parties agree upon a different time or place.

Shortly after the above agreement was signed and filed with the FCC, the Commission gave its general approval to the contract but objected to the clause, called the reverter clause, that would give the stock of the buyer corporation to the holder of the note or some buyer at public sale in the event of default. The contract was later amended by the parties in March of 1961 to require consent of the FCC in the event of reverter. This amendment also increased the purchase price to $225,000 and the installment note to $180,000.

On September 28, 1960, Ward filed application with the Commission for consent to assign the broadcasting license and construction permit to WHRW, Inc. No action seems to have been taken on this application.

In March of 1961 Ward executed the following document:

### ASSIGNMENT AND/OR TRANSFER

I, Howard R. Ward, hereby assign, transfer and set over to THE VOICE OF THE MAUMEE VALLEY, INC., an Ohio Corporation, all my right, title and interest in and to a Standard Broadcast Station Construction Permit as modified, granted by the Federal Communication Commission, together with any and all rights to a 250 watt license on 730 KC. The Federal Communication Commission file No. being BMP–8577 and AP–10884. The radio station call letters being WHRW.

This assignment and/or transfer is made subject to the prior approval of the Federal Communication Commission and is not to become effective until after the approval by the Federal Communication Commission and such approval has become final.

(S)   Howard R. Ward
HOWARD R. WARD
*Permittee*
BMP–8577 ; AP–10884
WHRW

(S)   PAULINE L. WARD
      *Witness*
(S)   SUZANNE W. MILLER
      *Witness*

The above document was part of a 57-page application to the FCC for consent to the above assignment (FCC Form 316 and attachments) filed by Ward with the FCC in March of 1961. Also in March of 1961, Ward as an individual and as president of the Voice of the Maumee Valley, Inc., and Max H. Good, as president of the Memorial Foundation, joined in a letter which they signed and executed in affidavit form with attestation clauses which provided as follows:

MR. BEN F. WAPLE, ACTING SECRETARY
*Federal Communications Commission*
*Washington 25, D.C.*

Re: BAPL-221

DEAR MR. WAPLE:

This letter further amends the pending application (BAPL-221) for voluntary assignment of the license and construction permit for standard broadcast station WHRW, Bowling Green, Ohio, from Howard R. Ward, *et al.* to WHRW, Inc.

On March 6, 1961, an application was submitted to the Commission on FCC Form 316 requesting its consent to the assignment of the foregoing license and construction permit from Howard R. Ward, as an individual, to Voice of the Maumee Valley, Inc., a corporation wholly controlled by Mr. Ward, which is already the owner of the physical assets of standard broadcast station WHRW. Upon approval of this application, the authorizations which are to be transferred ultimately to WHRW, Inc. pursuant to the above-referenced application will first be assigned to Voice of the Maumee Valley, Inc. Thereupon it will be appropriate to amend the pending application for assignment of these authorizations to WHRW, Inc. to show Voice of the Maumee Valley, Inc. as the assignor rather than Mr. Ward.

Accordingly, it is respectfully requested that the above-referenced application be amended throughout to substitute Voice of the Maumee Valley for Howard R. Ward as assignor. This amendment is, of course, contingent on prior approval of the application filed March 6, 1961.

It is stipulated that the FCC, on June 21, 1961, simultaneously granted Ward's request for permission to assign the radio station license from himself to the Voice of the Maumee Valley, Inc., and the immediate assignment from the Voice of the Maumee Valley, Inc., to WHRW, Inc.

The sale of the radio station and the transfer of the license to WHRW, Inc., was completed on June 28, 1961, with the corporation giving its written "Assignment" of the license 3097 and its itemized bill of sale of the physical assets of the station to WHRW, Inc., for $48,680.61 in cash and the buyer's note for $180,000 made out to the Voice of the Maumee Valley, Inc., as payee.

In docket No. 440-65 involving the personal income taxes for Howard Ward for the year 1961, respondent made five adjustments and the parties are in agreement and have stipulated as to four of these adjustments. The remaining adjustment is an addition to income shown in the notice as "(a) Sale of radio station, $225,000.00."

In the explanation of adjustments in the notice it is stated:

It has been determined that during taxable year 1961 you realized, and did not report * * * gain in the amount of $225,000.00 attributable to the sale of assets of a radio station known as "WHRW" * * *

In docket No. 441-65 involving the income tax of Rossford Terminal Warehouse, Inc., for the year ending November 30, 1961, respondent made seven adjustments. The parties are in agreement and have stipulated as to these adjustments and a further adjustment will only be necessary if gain on the sale of the license is taxed to Ward in docket No. 440-65.

On brief, respondent states he "concedes all alleged transfers except the radio station license" which he contends was properly valued at $170,000.

In docket Nos. 442-65 and 443-65 respondent has determined transferee liability of the petitioner, Rossford Terminal Warehouse, Inc., as transferee of Howard R. Ward in the amounts of $227,489.31 and $47,097.91, respectively. The basis for the transferee claim in docket No. 442-65 is the asserted deficiency in Ward's 1961 tax in the amount of $216,656.49. The basis for the transferee liability in docket No. 443-65 is the asserted deficiencies in Ward's income tax for the years 1956, 1957, and 1959 in the amounts of $22,591, $2,606, and $6,425, respectively, plus additions under section 6651(a) and section 6653(a). These deficiencies for the years before 1961 are established by pleading admissions.

In the notices in both of these transferee dockets it is stated:

The records of this office indicate that you received assets of Howard R. Ward at various times during the years 1956 through 1963 and that such transfers rendered Howard R. Ward insolvent. Accordingly, you are liable as a transferee of assets of Howard R. Ward for the unpaid deficiencies of income tax, additions to tax, and interest determined to be due from Howard R. Ward for the taxable years ended December 31, 1956, December 31, 1957 and December 31, 1959.

Petitioner corporation denied Ward's 1961 tax deficiency and in both dockets denied any transferee liability.

#### OPINION

Respondent's position, as stated on brief, is "the radio station license was owned by Howard R. Ward when the contract for sale was entered into [in June of 1961] and the gain realized on the sale of the radio station license should be taxed to Howard R. Ward, individually. In addition, the radio station license was transferred by Ward to the Voice of the Maumee Valley, Inc., voluntarily, without consideration, and such transfer rendered him insolvent. The Voice of the Maumee Valley, Inc. [now named Rossford Terminal Warehouse, Inc.], is therefore a transferee of Howard R. Ward and liable

for Howard R. Ward's unpaid tax liabilities for the years 1956, 1957, 1959, and 1961."

Respondent admits that the 1955 bill of sale and assignment was effective to convey all of the tangible assets of the radio station. But, respondent argues, Ward retained ownership of the radio station license until June of 1961; that the license, which was still in Ward's name with the FCC, was then of the value of $170,000; and, presumably, since Ward's basis in the license was zero, Ward realized $170,000 capital gain when, with the FCC's consent, he transferred it to the corporation in June of 1961 and the corporation then assigned the license to the third-party purchaser.

The first issue, presented in docket No. 440-65, is whether Ward realized this $170,000 gain in 1961 when, with the FCC approval, he assigned the license to the corporation in June of that year which license was then assigned by the corporation to the bona fide purchaser of the station.

Respondent argues the 1955 bill of sale and assignment "with regard to the radio station license is ambiguous." Respondent contends that the license could not possibly be transferred without the consent of the FCC so if it had specifically stated Ward's license was being assigned to the corporation it would still have been ineffective to operate as a 1955 transfer of the license. 47 U.S.C. sec. 310(b) provides:

No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making application under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.

The regulation of the Commission with respect to transfers and assignments of station licenses follows in general the language of the statute (47 U.S.C. sec. 310(b), *supra*). See 47 C.F.R. sec. 21.28. In the Commission's regulation, 47 C.F.R. sec. 21.29(h), provision is made for the use of FCC forms whenever application for consent to assignment of a radio station construction permit or license is being made as a result of a voluntary or involuntary act. This regulation goes on to provide the application "shall be accompanied by a factual showing by the assignee of his legal, financial, technical and other qualifications to be the licensee of the radio facilities described in such application."

It is of no consequence that the 1955 assignment contained no provision specially providing it was not to be effective as an assignment of the license until approved by the FCC. In *Mester* v. *United States*, 70

F. Supp. 118,[2] the court, in effect, said such a clause requiring FCC approval would be implied in every contract for the sale of a radio station. In the course of the opinion, the court said (p. 123):

Every contemplated transfer of a radio station which is made the subject of contract must by law hinge upon a valid approval by the Federal Communications Commission. The parties here did no more than to incorporate that implication into their express agreement. * * *

However, as stated, the first issue here is whether any gain realized in June of 1961 when the radio station was sold to a bona fide purchaser was Ward's gain or the corporation's gain. That issue is not decided by any finding that the 1955 transfer of the broadcasting station to the corporation did not accomplish a transfer of the license to the corporation. We can assume it did not for FCC approval for the transfer was not obtained in 1955.

The power to license a radio station is within the exclusive jurisdiction of the Federal Communications Commission. 47 U.S.C. sec. 307, provides: "The Commission, if public convenience, interest, or necessity will be served thereby," shall grant a station a license provided for in the Federal Communications Act.

47 U.S.C. sec. 308, provides, in part:

(a) The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor * * *

(b) All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; * * *

47 U.S.C. sec. 312, provides, in part, that "(a) The Commission may revoke any station license or construction permit * * * (2) because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license or permit on an original application."

The basic purpose of the Federal Communications Act of 1934, as amended, 47 U.S.C. sec. 301 et seq., is regulation in the public interest and not the creation of private rights. *Daly* v. *Columbia Broadcasting System, Inc.*, 309 F. 2d 83; *Radio Station WBIR, Inc.*, 31 T.C. 803; *Commission* v. *Sanders Radio Station*, 309 U.S. 470. In the last-cited case, the Supreme Court said:

In short, the broadcasting field is open to anyone, provided there be an available frequency over which he can broadcast without interference to others, if he shows his competency, the adequacy of his equipment, and financial ability to make good use of the assigned channel.

The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license. Licenses are limited to a maximum of three years' duration, may be revoked, and need not be renewed. Thus the channels presently occupied remain free for a new assignment to another licensee in the interest of the listening public.

---

[2] Three-Judge Federal Court for E.D. N.Y., affirmed per curiam 332 U.S. 749.

While we agree with respondent that the 1955 assignment was ineffective to transfer the license to the corporation, it is merely stating the obvious to say that it created an obligation on the part of Ward to secure a Commission-approved assignment of the FCC license. Ward's 1961 Commission-approved assignment of the FCC license to the corporation was merely the fulfillment of that 1955 obligation for which issuance to Ward of all of the corporation's stock was "sole consideration." It would seem to require no argument that a sweeping assignment of all assignable licenses would carry with it the obligation to execute and deliver the document necessary to effect a license transfer.

Ward's 1955 assignment was an obligation to "Assign * * * to the aforesaid corporation any and all licenses which have heretofore been issued to me, to the extent that such licenses are assignable." This must mean he was obligating himself to do whatever was necessary to make a valid effective assignment of any assignable license and especially the vital FCC license. The FCC license was certainly assignable. There are, as we have pointed out, statutes and regulations telling how it should be done. And the Commission has forms to be used in transferring a license. Ward knew the assignment of the FCC license had to be approved by the FCC before it would be effective. Therefore, his obligation with respect to assignment of the FCC license was to secure the FCC approval for the assignment of the FCC license.

This was a case where the station owned by Ward was merely being incorporated. The transfer of the station by Ward to the corporation for all of its capital stock was not the subject of close negotiations between transferor and transferee. Ward had a right to think Commission approval would be almost automatic and this approval could follow the transfer.

When a radio station is being sold, the FCC does not have unlimited authority to withhold its approval of a license transfer to the transferee named in the contract for the sale of the station. It can withhold approval only if it would hold the intended transferee an unqualified applicant for an original license. And it has to make such holding without considering any application by one other than the proposed transferee. See sec. 310, *supra*. In *Mester* v. *United States, supra*, it was held the proposed transferee of a radio station had the right to have the validity of the Commission's order refusing to approve a transfer determined by the court.

Respondent seems to argue that, at the time he transferred the station to the corporation in 1955 Ward, in spite of the special paragraph providing for assignment of licenses, harbored the intention not to transfer the license.

It is almost unthinkable that Ward would wish to terminate the life of the station by transferring the physical assets of the station to the corporation for all of its stock with no obligation on his part to secure an effective assignment to the corporation of the station's license. Yet this is what would occur by a transfer of the station and deliberately retaining the license. Under the applicable statutes and regulations this would be a sure way to render both the license and the corporation worthless. The physical property of a radio station, without a license to broadcast, would have no great value and the license in Ward's name without his owning facilities to broadcast would be of no value at all to him. He could not sell it. The Federal Communications Act and the Commission's regulations thereunder make it clear that there will be no trafficking in licenses.

All that Ward could possibly do with respect to the license that stood in his name was request the FCC to approve its transfer to the corporation. If he did not make such request the FCC could have revoked his license under section 312, *supra*, since he owned no broadcasting facilities.

The $150,000 figure in 1955 included the license. The itemized bills of sale of the 1955 and 1961 transactions show that substantially all of the assets that were there in 1955 were also there in 1961. The corporation's 1961 income tax return shows much additional electronic equipment, a building, and towers had been acquired since 1955 and the return shows the corporation was then carrying all its physical assets at a cost basis of something over $91,000.

In determining whether it was understood that the 1955 transfer was meant to be followed by a Commission-approved license, it is appropriate to consider that the Ohio State Securities Commission gave its approval to the issuance of $150,000 worth of stock for the transfer of this station. The record here shows the appraiser who valued the station, and on whose valuation the Ohio State Securities Commission relied, valued the station with a license to broadcast. Ward testified the valuation included a license to broadcast. It would be like charging Ward with fraud in securing this stock for assets approval from the Ohio State Securities Commission to say he was not bound to secure the effective transfer of the station's broadcasting license.

Respondent's position is not helped by the fact that a delay occurred between the transfer of the broadcasting station and an effective transfer of the station's license. Respondent's position is the same as it would have been if the Commission-approved license assignment was delivered in January of 1956 (when Ward first got the assignment forms) and respondent was asserting Ward realized 1956 gain by such delivery.

The fact that Ward did not fill out and file promptly the transfer forms sent to him by the FCC in January of 1956, or that he did nothing more with respect to securing an approved transfer of the license to the corporation until June of 1961 is of no consequence on the issue of whether he realized gain when the approved transfer was made.

As pointed out earlier, the FCC is charged with the task of regulating the use of the airwaves in the public interest. Its license is not a franchise or any kind of government grant to the named licensee of exclusive use of the wave length described in the license. *Commission v. Sanders Radio Station, supra.* The license is part of the Commission's regulatory process. The record here indicates the Commission knew, at least in 1956, that Ward had incorporated his station. It may well be that the Commission felt its power to control the station in the public interest would not be seriously affected as long as the broadcasting was done by the corporation that owned the station property and was 100-percent controlled by Ward. But we need not speculate as to the FCC attitude. It is enough to say respondent's position is not strengthened by reason of the fact that some 5 years intervened between incorporation of the station and the execution of the Commission-approved FCC license. Ward testified as to some events that he said delayed his seeking approval of the license transfer. He told of extensive sale negotiations, an application for increased power to protect the station which had to be filed quickly, and many amendments to the application. He said he was bothered by personal troubles for during this period his father, mother, and wife died. Whenever Ward delivered the effective license transfer he was doing what he had agreed to do.

We know that Ward was not paid anything for the 1961 assignment of the license. Ward was doing that which he was obligated to do under the 1955 assignment when he made the Commission-approved assignment of the license in 1961. Ward realized no gain of $170,000 [3] and, in fact, no gain at all in 1961 when, with the Commission's approval, he assigned the license to the corporation, and it was immediately transferred by the corporation to a bona fide purchaser.

Our holding on the first issue, that Ward was merely fulfilling a prior obligation when he transferred the license to the corporation with the FCC approval, is decisive of the issue in docket No. 442–65 and docket No. 443–65. These are the dockets wherein respondent seeks to hold the corporation liable as transferee of Ward. Since respondent's position is grounded on Ward's alleged gratuitous transfer of a $170,000 FCC license to the corporation at a time when he owed tax,

---

[3] Respondent's expert witness who testified the license was worth $170,000 was stating its value as an intangible asset of a broadcasting station. He was not asked what it would be worth in the hands of a licensee who owned no broadcasting facilities. Obviously, under the statutes, it would be worth nothing to such a licensee.

and the transfer rendered him insolvent, the entire case falls with our holding that the 1961 assignment of the license was pursuant to prior obligation.

In passing we might observe that in these dockets where respondent is attempting to assert transferee liability he is relegated to the status of a State creditor seeking to invalidate a fraudulent conveyance. *Commissioner* v. *Stern*, 357 U.S. 39. It is a general rule that only property that can be subjected to the satisfaction of debts can be fraudulently conveyed. 37 C.J.S., sec. 8, Fraudulent Conveyances; 24 Am. Jur., sec. 106, Fraudulent Conveyances. Since respondent relies entirely on the conveyance of the license, he would have the burden of showing the license could be subjected to the tax liability.

For the purpose of giving effect to agreed issues,

> *Decisions will be entered under Rule 50 in all dockets.*