William T. and Ann Male v. Commissioner of Internal Revenue, Respondent. William T. Male, transferee of Fleet Highway Freight Lines, Inc., a dissolved corporation v. Commissioner.
Male v. Commissioner
Docket Nos. 803-70, 804-70.
United States Tax Court
T.C. Memo 1971-301; 1971 Tax Ct. Memo LEXIS 31; 30 T.C.M. (CCH) 1282; T.C.M. (RIA) 71301; November 29, 1971, Filed. Thomas N. Chambers, Charles Q. Gage, 1601kanawana Valley Bldg., Charleston, W. Va., and Louis S. Southworth, II, for the petitioners. Conley G. Wilkerson, for the respondent. QUEALY
*32 Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the income tax of petitioners William T. and Ann Male in the amounts of $4,705.58 for the taxable year ended December 31, 1965, and $20,850.81 for the taxable year ended December 31, 1966. In addition, the respondent determined a deficiency in income tax of Fleet Highway Freight Lines, Inc. for the short taxable year ended October 31, 1967, in the amount of $56,435.25. William T. Male is liable, as transferee, for any deficiency due from that corporation. The cases were consolidated for the purposes of trial, briefing, and opinion. 1283 The principal issue presented for decision is whether all of the assets of Fleet Highway Freight Lines, Inc. (hereinafter referred to as "Fleet"), less assets retained to meet claims, were distributed, pursuant to a plan of complete liquidation adopted on August 3, 1964, within the 12-month period beginning on the date of adoption of such plan, as provided in section 337(a). [1] If that issue should be resolved against the petitioners, it must then be decided whether Fleet was a "regulated transportation company" within the meaning of section 172(b) *33 (1)(C) during the taxable years 1966 and 1967. Findings of Fact Some of the facts have been stipulated; the stipulations and the exhibits attached thereto are incorporated herein by this reference. William T. Male and Ann Male, the petitioners in Docket No. 803-70, are individuals, husband and wife, who at the time of the filing of the petition herein resided in Charleston, West Virginia. The petitioners filed their joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Parkersburg, West Virginia. Ann Male is a petitioner herein solely by reason of having filed joint Federal income tax returns with her husband for the taxable years 1965 and 1966. William T. Male, as transferee of the assets of Fleet Highway Freight Lines, Inc., is also the petitioner in Docket No. 804-70. Accordingly, Mr. Male will hereinafter be referred to as the petitioner. Fleet was a regulated motor carrier with its principal offices in Parkersburg, West Virginia, operating under a certificate of public convenience or operating *34 rights issued by the Interstate Commerce Commission and the West Virginia Public Service Commission. It had terminals located in Wheeling, West Virginia, Parkersburg, West Virginia, Charleston, West Virginia, Huntington, West Virginia, and Cincinnati, Ohio. Fleet derived all of its revenues from the transportation of interstate and intrastate freight pursuant to tariffs or rates, all of which were approved by the Interstate Commerce Commission and the West Virginia Public Service Commission. At all times material herein, the petitioner was president and a major stockholder of General Truck Sales Corporation, a corporation engaged in the sale and service of heavy-duty trucks and truck tractors at Charleston, West Virginia. In September, 1960, the petitioner endorsed certain notes given by Mr. Art Hartley for the purchase of the stock of Fleet. By May, 1961, the notes were in default and it became apparent to the petitioner that Mr. Hartley would be unable to make any further payments on the notes. Accordingly, in order to provide funds for the payment of the notes, on or about June 30, 1961, the petitioner purchased from Mr. Hartley 2,500 shares of stock of Fleet, being all of its *35 issued and outstanding stock, for the sum of $275,000. Petitioner thereupon became president and sole stockholder of Fleet. During the years 1961 through 1964, Fleet incurred net operating losses of $175,501.74. Due to the nature of the territory in which Fleet was licensed to operate, petitioner concluded that he would be unable to develop sufficient freight movement in order for Fleet to earn a profit. Therefore, petitioner initiated negotiations for the purpose of selling either the corporation as a whole, or its operating rights. As of June 16, 1964, petitioner entered into an agreement, both in his individual capacity and as president of Fleet, whereby an option was granted to Eazor Express, Inc. (hereinafter referred to as "Eazor") to purchase both the interstate and the intrastate operating rights of Fleet. On August 3, 1964, a special meeting of the stockholders of Fleet was held. Petitioner, as the sole stockholder, presided as chairman. A resolution was passed adopting a plan of liquidation of Fleet as follows: RESOLVED, that in complete and final liquidation of this corporation, pursuant to Section 337 of the Internal Revenue Code of the United *36 States of 1954, as amended, that there be sold, transferred, and conveyed all of its corporate assets and property, real and personal, together with any other property or assets subsequently acquired during the period of liquidation and that said assets and property, or the proceeds thereof, shall be paid and distributed to the holders and owners of the capital stock of the corporation. BE IT FURTHER RESOLVED that this corporation, after distribution of its assets and payments of its liabilities, 1284 discontinue its business and voluntarily dissolve and surrender its charter issued by the Secretary of State of the State of West Virginia. BE IT FURTHER RESOLVED that the officers and directors of this corporation be and are hereby authorized, empowered, and directed to take such actions and to execute such assignments or other instruments as may be necessary in carrying out the liquidation as hereinbefore provided. By agreement dated August 12, 1964, entered into by the petitioner on behalf of Fleet, as its president, and in his individual capacity as sole stockholder of Fleet, petitioner agreed to sell to Eazor the operating rights of Fleet for the sum of $260,000 of which *37 $185,000 was allocated to the certificate issued by the Interestate Commerce Commission and $75,000 was allocated to the certificate issued by the West Virginia Public Service Commission. Completion of the sale was contingent upon approval of the transfer by the Interestate Commerce Commission and the West Virginia Public Service Commission. [2] In recognition of the necessity for obtaining the approval for the transfer of both certificates, the agreement made provision for the interim operation of the routes by the purchaser upon the granting of a temporary certificate. On August 21, 1964, an "Agreement Covering Temporary Operations" was entered into between Fleet and Eazor for the interim operation of the routes pending the necessary approvals by the regulatory agencies. Pursuant to this agreement, Fleet "leased" to Eazor all of Fleet's operating rights, to commence as soon as Eazor obtained temporary authority to operate and continuing for 180 days, *38 or such longer period as necessary, until final approval for the transfer was obtained from the Interstate Commerce Commission. During this period, Eazor agreed to pay a rental of $50 for each month of its operations. On September 15, 1964, Eazor was granted temporary authority by the Interstate Commerce Commission to operate the motorcarrier properties of Fleet. Eazor took over the routes of Fleet immediately upon receiving this authority. Once Eazor was granted temporary operating authority, petitioner proceeded to liquidate the business of Fleet pursuant to the resolution of August 3, 1964. Fleet stopped hauling freight the day Eazor received its authority and thereafter closed its terminals, let all of its employees go, sold all of its equipment, and closed all of its bank accounts. Excepting only the subject matter of the Agreement of Sale, the date of disposition of which is in dispute herein, Fleet had disposed of all of its assets within a 12-month period after the adoption of a plan of liquidation on August 3, 1964. Fleet filed a tax return for the short year July 1, 1965 through July 31, 1965, indicating that this was a "Final" return. In this return, Fleet reported *39 long-term capital gain from the sale of "operating permits" in the amount of $225,741. The return contained a statement that: The corporation is in process of liquidation under the pervisions [provisions] of Section 337 of IRC of 1954, therefore the gain is not included in income of the corporation - Form 966 has been duly filed. Federal income tax returns have not been filed by Fleet for any period or periods subsequent to July 31, 1965. Any obligations of Fleet remaining unpaid as of July, 1965 were thereafter paid by Mr. Male, personally, out of his personal account. From and after July 31, 1965, no expenses or liabilities were incurred by or on behalf of Fleet. A proceeding was also initiated before the Interestate Commerce Commission by or in the names of Fleet and Eazor, jointly, for approval of the transfer of the permanent certificate of convenience to operate the routes in question. The matter was duly scheduled for hearing in accordance with the rules of the Commission. However, the application was delayed on account of contestants for the routes. After several hearings, final approval of the transfer was granted on June 20, 1967. Thereafter, *40 on August 23, 1967, the West Virginia Public Service Commission likewise entered an order approving the transfer of that certificate from Fleet to Eazor. Fleet was dissolved by decree of the Circuit Court of Kanawha County, West Virginia, on April 26, 1968, for failure to pay its corporate franchise tax due July 1, 1967 for the fiscal year July 1, 1967 through June 30, 1968. On or about October 10, 1967, Eazor issued its checks, payable to the petitioner, in the 1285 amount of $66,200. This represented the $75,000 cash payment Eazor was required to make under the agreement, less credit for the $50 per month rental payments as provided in the agreement, and a reimbursement to Eazor for expenses which petitioner was required to pay under the terms of the agreement. Eazor also delivered a promissory note, dated October 9, 1967, payable to petitioner in the amount of $185,000. This note was in satisfaction of the remainder of the purchase price as provided in the agreement. Opinion Fleet was a regulated interstate and intrastate motor carrier operating under certificates of convenience issued by the Interstate Commerce Commission and the West Virginia Public Service Commission. *41 From June 30, 1961 until the date of dissolution of the corporation, petitioner was the sole stockholder of Fleet. Operations had resulted in substantial losses. Petitioner decided to sell the business. On June 16, 1964, petitioner granted Eazor an option to purchase the interstate and intrastate operating certificates of Fleet. Theafter, on August 3, 1964, a special stockholders' meeting of Fleet was held, and petitioner voted to liquidate the corporation pursuant to section 337. This was followed by an agreement of sale, dated August 12, 1964, whereby Eazor agreed to purchase the interstate and intrastate operating certificates of Fleet for $260,000. Final consummation of the sale, however, was contingent upon approval of the transfer of the operating certificates by both regulatory bodies involved. In the event either regulatory body did not approve the transaction or approved the transfer of the operating certificates with any conditions, limitations, or modifications, Eazor had the right to refuse to close the transaction and to terminate the agreement. Shortly thereafter, Eazor applied for and received approval from the Interstate Commerce Commission to temporarily operate *42 the motor carriers of Fleet. Once such temporary approval had been received by Eazor, Fleet stopped hauling freight, closed its terminals, discharged its employees, sold its equipment, closed all of its bank accounts, and ceased to do business. In its final return for the period ended July 31, 1965, Fleet reported a gain of $225,741 from the purported sale of its operating certificates. In such return, the transaction was treated as a sale on which no gain or loss was recognizable under section 337. Section 337 provides in pertinent part as follows: (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. The first question presented for decision is whether Fleet sold its operating certificates within the 12-month period beginning with the adoption of the plan of liquidation. The petitioner *43 argues that the agreement itself constituted a "sale or exchange" within the meaning of section 337. In support of this argument, petitioner cites section 1.337-2 (a), Income Tax Regs., which states that the date on which a sale occurs depends primarily upon the intent of the parties. While it is certain that the parties to the contract for the sale of Fleet's operating certificates intended the sale to take place at the earliest practicable date, it is equally certain from the conditions set forth in the agreement itself that such sale could not take place prior to the final approval by the regulatory agencies. The agreement provided that "[the] parties shall consummate this transaction only after final approval of both transfers by the West Virginia Public Service Commission and the Interstate Commerce Commission." [3] Any modifications of the terms of the agreement by the Interstate Commerce Commission were grounds for Eazor to refuse to consummate the sale. Further, following a grant of temporary authority by the Interstate Commerce Commission to Eazor, Eazor was to pay rent at a rate of $50 per month, with the payments applying to the final purchase payment price. *44 Clearly, the agreement was intended to be no more than an executory contract. 1286 Nothing could be consummated until the approval of the transfers by the respective regulatory agencies. Moreover, this approval was more than a mere formality. The grant of temporary operating authority "* * * creates no presumption that corresponding permanent authority will be granted thereafter." Interstate Commerce Act, sec. 210a (a); 49 U.S.C.A. sec. 310a(a). In the alternative, petitioner argues that all rights under the contract were distributed to him in the liquidation of Fleet within the 12-month period. The undisputed facts show that, prior to the expiration of the 12-month period, Fleet had distributed all of its assets, other than the bare legal title to the certificates of convenience issued in its name by the Interstate Commerce Commission and the West Virginia Service Commission. The petitioner and Fleet had contracted to sell the certificates of convenience to Eazor. Pending approval of the transfer by the respective regulatory agencies, Fleet was prevented from completely divesting itself of legal title to those assets. [4] Clearly, Fleet had done everything *45 required of it to comply with the statutory requirements. The final Federal income tax return of Fleet was filed for the period ended July 31, 1965. At that time, Fleet held no property, had no bank account and, except as a nominal party in the proceedings before the regulatory agencies, had ceased to exist as a viable corporation. While Fleet could not be formally dissolved until the transfer of the certificates had been approved, we do not regard this as a bar to compliance with section 337. Dissolution is not a prerequisite to liquidation. Alameda Realty Corporation, 42 T.C. 273 (1964). *46 There was clearly a complete liquidation of Fleet within the 12-month period sufficient to meet the requirements of the statute. Respondent argues that, in completing the sale, petitioner was acting on behalf of Fleet, and that the sale must be attributed to Fleet. He contends that Fleet could not have assigned its claim to the purchase price to petitioner because such a claim did not exist at any time during the 12-month period. However, as this Court stated in Howard R. Ward, 48 T.C. 803 (1967), where the parties enter into a contract for the transfer of a license, subject only to the approval of the regulatory agency, the rights and obligations of the parties thereby become fixed. The agreement was executed by petitioner not only on behalf of Fleet, but also in his individual capacity as sole shareholder. When Fleet sold or distributed all of its assets, and ceased to do business, it became a mere empty "shell." The rights and obligations of the seller under the contract were assumed by the petitioner in his individual capacity. The sale was completed by the petitioner in that capacity. Respondent contends that this result is contrary to the holding in Commissioner v. Court Holding Co., 324 U.S. 331 (1945). *47 Section 337 was enacted for the specific purpose of avoiding the result sought by the respondent here, regardless of whether the sale was attributed to the corporation or to the stockholders. It would defeat the purpose of the statute if we held otherwise. See Bird Management, Inc., 48 T.C. 586 (1967). Therefore, we find and hold that Fleet was liquidated within the provisions of section 337. As a result of this decision, we do not need to discuss the alternative issue raised by petitioner. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Paragraph 20 of the agreement concluded: * * * The parties shall consummate this transaction only after final approval of both transfers by the West Virginia Public Service Commission and the Interstate Commerce Commission.↩
3. This clause was consistent with the requirements of section 5(2) of the Interstate Commerce Commission Act, 49 U.S.C.A. Sec. 5(2), and W. Va. Code Ann., Sec. 24A-2-5(c)↩ (Michie, 1966).
4. Fleet's operating authority could not have been legally distributed to petitioner without the prior approval of the Interstate Commerce Commission and the West Virginia Public Service Commission. Interstate Commerce Act, Sec. 212; 49 U.S.C.A. Sec. 312; W. Va. Code Ann., Sec. 24A-205↩(c) (Michie, 1966). Since Fleet and petitioner had previously requested the Interstate Commerce Commission and the West Virginia Public Service Commission approval of the transfer from Fleet to Eazor, any further requests presumably would have resulted in a longer time delay before obtaining the desired assents.