MACLIN P. DAVIS, JR., AND DOROTHY S. DAVIS; LAURENCE B. HOWARD, JR., AND CORNEILLE T. HOWARD; ALLAN MURPHY AND ESTATE OF MARION E. MURPHY BY ALLAN MURPHY, EXECUTOR, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2915-74.    Filed May 17, 1976.

---

*H. Stennis Little, Jr.,* and *William B. Owen,* for the petitioners.
*John B. Harper,* for the respondent.

QUEALY, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the taxable year 1969 as follows:

| Petitioners | Deficiencies |
|---|---|
| Maclin P. Davis, Jr., et ux _____ | $5,469.52 |
| Laurence B. Howard, Jr., et al _____ | 5,839.43 |
| Allan Murphy, et al _____ | 1,866.10 |

Petitioners joined in the filing of the petition pursuant to Rule 61(a), Tax Court Rules of Practice and Procedure.

Certain of the adjustments to income in the respective notices of deficiencies have not been contested by the parties, leaving for consideration the sole question whether the petitioners, as partners, are entitled to deduct the losses incurred in the taxable year 1969 from the operation of certain apartment projects in which the petitioners, or the corporations in which petitioners were stockholders, had an interest.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Maclin P. Davis, Jr., and Dorothy S. Davis are husband and wife. At the time the petition in this case was filed, they resided at Nashville, Tenn. They filed a timely individual income tax return (Form 1040) for the taxable year 1969 with the Director of the Southeast Service Center at Chamblee, Ga.

Petitioners Laurence B. Howard, Jr., and Corneille T. Howard filed a joint individual income tax return (Form 1040) for the taxable year 1969 with the Director of the Southeast Service Center at Chamblee, Ga.

Petitioner Laurence B. Howard, Jr., resided at Nashville, Tenn., on the date the petition in this case was filed. Petitioner

Corneille T. Howard resided at Franklin, Tenn., on the date the petition was filed.

Petitioner Allan Murphy and his late wife Marion E. Murphy filed a joint individual income tax return (Form 1040) for the taxable year 1969 with the Director of the Southeast Service Center at Chamblee, Ga. Allan Murphy resided at Nashville, Tenn., on the date the petition was filed.

Harpeth Homes, Inc., is a Tennessee corporation incorporated on July 6, 1966. The corporation was formed for the purpose of constructing, developing, and operating an apartment project in Williamson County, Tenn., known as Hillside Manor Apartments. On November 19, 1969, for its fiscal year ended May 31, 1969, Harpeth Homes, Inc., filed a U.S. Corporation Income Tax Return (Form 1120) with the Director of the Southeast Service Center at Chamblee, Ga.

Bedford Manor, Inc., is a Tennessee corporation incorporated on December 11, 1967, for the purpose of constructing, developing, and operating an apartment complex in Bedford County, Tenn., known as Bedford Manor Apartments. For its fiscal year ended September 30, 1969, Bedford Manor, Inc., filed a U.S. Corporation Income Tax Return (Form 1120) on March 16, 1970, with the Director of the Southeast Service Center at Chamblee, Ga.

Urban Manor East, Inc., is a Tennessee corporation incorporated on December 11, 1967, for the purpose of constructing, developing, and operating an apartment complex located in Davidson County, Tenn., known as Urban Manor East Apartments. For its fiscal year ended January 31, 1970, Urban Manor East, Inc., filed a U.S. Corporation Income Tax Return (Form 1120) on March 27, 1970, with the Director of the Southeast Service Center at Chamblee, Ga.

At all times material herein, the stockholders of and their respective percentages of stockholdings in Harpeth Homes, Inc., Bedford Manor, Inc., and Urban Manor East, Inc., were:

| Stockholder | Harpeth Homes, Inc. | Bedford Manor, Inc. | Urban Manor East, Inc. |
|---|---|---|---|
| Laurence B. Howard, Jr. | 64% | | |
| Nancy Howard or Laurence B. Howard, Jr. | | 67% | 30% |
| Gerson Schklar | 16% | | |
| Triangle Construction Co. | | 15% | 30% |
| Allan Murphy | 16% | 10% | 30% |
| Maclin P. Davis | 4% | 8% | 10% |
| Totals | 100% | 100% | 100% |

On July 26, 1966, Harpeth Homes, Inc., obtained a mortgage loan of $505,800 from the Glen Justice Mortgage Co., Inc., of Dallas, Tex., to finance 100 percent of the construction costs of an apartment complex. Harpeth Homes, Inc., through its president, Laurence B. Howard, Jr., executed a "regulatory agreement" with the Federal Housing Administration (hereinafter referred to as FHA) under which the FHA insured the $505,800 mortgage loan.

On January 18, 1968, Bedford Manor, Inc., obtained a mortgage loan of $1,181,300 from Guaranty Mortgage Co. of Nashville, Tenn., to finance 100 percent of the construction costs of an apartment complex. Bedford Manor, Inc., entered into a "regulatory agreement" with the Federal Housing Administration guaranteeing the payment of the loan to Guaranty Mortgage Co.

On January 18, 1968, Urban Manor East, Inc., obtained a mortgage loan of $714,000 from Guaranty Mortgage Co. of Nashville, Tenn., to finance 100 percent of the construction costs of an apartment complex. Urban Manor East, Inc., entered into a "regulatory agreement" with the FHA under which the FHA insured the loan from Guaranty Mortgage Co.[1]

In each case, the regulatory agreement provided that approval of the Federal Housing Commissioner shall be required for the adoption of rental schedules; the conveyance, transfer, or encumbrance of the property; the assignment, transfer, or encumbrance of any personal property of the project, including rent; the "payout" of any funds, other than reasonable operating expenses and necessary repairs, except from "surplus cash," such

[1] The mortgage loans were insured under sec. 221(d)(3) of the National Housing Act (Housing Act of 1954, tit. I, sec. 123, 68 Stat. 601, 12 U.S.C. sec. 1715*l*(d)(3)). The subsidized interest program was extended by sec. 236 of the National Housing Act (Housing and Urban Development Act of 1968, tit. II, sec. 201(a), 82 Stat. 498, 12 U.S.C. sec. 1715z-1). See Housing and Urban Development Act of 1968, tit. II, sec. 201(c), 82 Stat. 502.

distribution or "payout" not to exceed 6 percent on the equity investment in any fiscal year; the entering into any contract for supervisory or managerial services; and the undertaking of any other business activity on the part of the mortgagor. As security, the agreement further provided for the assignment and pledge to the Commissioner of the rights of the mortgagor to the rentals, profits, income, and any charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property.

"Surplus cash" was defined in the regulatory agreement as the cash (exclusive of any special funds and tenant security deposits) remaining after payment of amounts due on the mortgage note, deposits to reserves, and all other obligations of the apartment complex. "Residual receipts," as used in the regulatory agreement, referred to any cash remaining after payment of distributions from "surplus cash." "Residual receipts" could not be distributed without prior written approval of the Federal Housing Commissioner. No distributions of "surplus cash" were ever made to petitioners from the income of the three apartment projects.

On September 18, 1968, the shareholders of Bedford Manor, Inc., entered into an agreement with that corporation which provided that the corporation would transfer the Bedford Manor Apartments to the shareholders and would thereafter manage the apartments as the agent of the shareholders.

The terms of said agreement were, as follows:

1. Grantor shall execute a deed conveying to Grantees as tenants in common Grantor's real estate at Shelbyville, Tennessee, subject to the mortgage encumbering said real estate.

2. Grantor shall continue to be liable on the note secured by said mortgage and said real estate shall continue to be subject to the mortgage lien to secure payments of said note.

3. Grantees shall not be liable for payment of said mortgage note, but said real estate shall be subject to being sold to pay said note.

4. The regulatory agreement between Grantor and the FHA shall remain in full force and effect without impairment of any of the obligations of Grantor thereunder.

5. Grantor shall manage said real estate, obtain tenants, collect rents, be responsible for maintenance and repairs at its expense, and, out of said rents, pay taxes on said real estate, make payments on said mortgage, pay insurance premiums for property damage coverage of the value of the improvements on said property and contents and liability coverage protecting Grantees and Grantor up to at least $500,000, pay Grantees the maximum amount allowed to

be paid out by the FHA and retain the residual receipts in accordance with said regulatory agreement.

6. If and when said residual receipts, or any portion thereof, are released by the FHA, the portion of such receipts so released shall be the property of grantor. .

7. If the FHA objects to said conveyance and has a lawful right to require that said real estate be conveyed back to grantor and requires that it be so conveyed, then said grantees shall convey said real estate back to grantor.

Similar agreements were entered into by Urban Manor East, Inc., and its shareholders with respect to the Urban Manor East Apartments on September 18, 1968, and by Harpeth Homes, Inc., and its shareholders with respect to the Hillside Manor Apartments on January 28, 1969.

On September 18, 1968, title to the Bedford Manor Apartments was conveyed by quitclaim deed from Bedford Manor, Inc., to Nancy Howard, Triangle Construction Co., Allan Murphy, and Maclin P. Davis, Jr., as tenants in common with interests in proportion to the stock ownership of each in Bedford Manor, Inc.

On September 18, 1968, title to the Urban Manor East Apartments was conveyed by quitclaim deed from Urban Manor East, Inc., to Nancy Howard, Triangle Construction Co., Allan Murphy, and Maclin P. Davis, Jr., as tenants in common with interests in proportion to the stock ownership of each in Urban Manor East, Inc.

On January 31, 1969, title to the Hillside Manor Apartments was conveyed by quitclaim deed from Harpeth Homes, Inc., to Gerson Schklar, Laurence B. Howard, Jr., Allan Murphy, and Maclin P. Davis, Jr., as tenants in common with interests in proportion to the stock ownership of each in Harpeth Homes, Inc.

Nancy Howard was rendered unconscious as a result of an automobile accident on October 8, 1968, and died in December 1968, without regaining consciousness. She died intestate, and her estate was administered in the Chancery Court of Davidson County, Tenn. As part of this administration, a decree was entered by the court in August 1969, approving the transfer of her interests in the real estate known as Bedford Manor Apartments and Urban Manor Apartments to Laurence B. Howard, Jr. The transfer of such real properties was accomplished by deeds from the Clerk and Master of the Chancery Court of Davidson County, Tenn., to Laurence B. Howard, Jr., dated August 21, 1969.

The FHA was verbally informed of the proposed conveyance of the properties by each corporation to its shareholders at about the time of the execution and delivery of the quitclaim deeds. However, the parties did not at that time request the formal approval of the Federal Housing Commissioner for the conveyance by quitclaim deed of any interest in said properties to the respective shareholders.

On October 3, 1969, the Area Director for the FHA wrote to Maclin P. Davis, Jr., stating that the FHA did not anticipate any objection to retroactive approval of the transfer of the properties.

During 1969, the Bedford Manor Apartments, the Urban Manor East Apartments, and the Hillside Manor Apartments were managed in the name of the three corporations as agents for the owners of the apartments under written management agreements entered into with the owners. The corporations, in turn, contracted with third parties for such management services.

The purpose of the conveyance of each of the apartment properties to the shareholders of each corporation was to enable the shareholders to deduct the operating losses on their individual returns.

At the times when the quitclaim deeds to the apartment properties were granted by the corporations to their shareholders, the respective fair market values of the real properties were at least equal to the outstanding mortgage liabilities encumbering such properties.

On February 21, 1973, an application for transfer of physical assets of Bedford Manor, Inc., was filed with the Department of Housing and Urban Development. The mortgagor-seller was shown on the application to be "Bedford Manor, Inc. (additional sellers—L.B. Howard, Jr., and Allan Murphy)." The purchaser was identified as Bedford Manor Apartments Co., a partnership composed of Triangle Construction Co., Inc., and Maclin P. Davis, Jr. The agreement was executed by Laurence B. Howard, Jr., and Allan Murphy and by Laurence B. Howard, Jr., on behalf of Bedford Manor, Inc.

On March 13, 1973, Bedford Manor, Inc., Triangle Construction Co., and petitioners Allan Murphy, Maclin P. Davis, Jr., and Laurence B. Howard, Jr., executed and delivered a bill of sale and a warranty deed transferring their interest in the personalty and realty of the Bedford Manor project to Bedford Manor Apartments Co., the partnership. Bedford Manor, Inc., warranted

the title to the realty transferred. The execution and delivery of the bill of sale and warranty deed were pursuant to a sale contract entered into between the parties (excepting Maclin P. Davis, Jr., as a seller) on February 14, 1973.

On March 14, 1973, Bedford Manor Apartments Co. entered into a regulatory agreement relating to the mortgage loan on the Bedford Manor property. Written approval (as contemplated in the regulatory agreement) of a transfer of the physical assets of Bedford Manor, Inc., to Bedford Manor Apartments Co., the limited partnership, was given by the Department of Housing and Urban Development on March 23, 1973.

On May 15, 1973, Urban Manor East, Inc., and Urban Manor East, a limited partnership composed of Laurence B. Howard, Jr., and Allan Murphy, general partners, and Maclin P. Davis, Jr., limited partner, and the Secretary of Housing and Urban Development, executed a "release agreement" wherein the corporation was relieved of all its obligations under the note dated January 18, 1968, and the partnership assumed certain obligations under the note, the deed of trust, and the regulatory agreement. The release agreement was executed pursuant to an "assumption agreement" of the same date. Under the assumption agreement, the limited partnership did not assume personal liability for payments due under the note.

On May 15, 1973, Allan Murphy, Maclin P. Davis, Jr., Laurence B. Howard, Jr., Triangle Construction Co., and Laurence B. Howard, Jr., on behalf of Urban Manor East, Inc., executed a warranty deed conveying their interest in the real property of Urban Manor East Apartments to Urban Manor East, the limited partnership.

On June 5, 1973, Laurence B. Howard, Jr., Allan Murphy, Maclin P. Davis, Jr., Triangle Construction Co., and Urban Manor East, Inc., executed and filed with the Department of Housing and Urban Development an application for transfer of the physical assets of Urban Manor East, Inc. Written approval (as contemplated in the regulatory agreement) of the transfer was given by the Department of Housing and Urban Development on July 16, 1973. The approved transferees were Laurence B. Howard, Jr., and Allan Murphy, general partners, and Maclin P. Davis, Jr., a limited partner, operating as Urban Manor East.

At the time of the trial in this case, no approval of any transfers of the physical assets of Harpeth Homes, Inc., had ever been given

by the FHA or the Department of Housing and Urban Development.

Harpeth Homes, Inc., filed its income tax returns on the basis of a fiscal year ended May 31. Hillside Manor Apartments, a partnership composed of the shareholders of Harpeth Homes, Inc., filed its partnership income tax returns on the basis of a calendar year.

In its income tax return for the fiscal year ended May 31, 1969, Harpeth Homes, Inc., reported the gross rents from Hillside Manor Apartments in the amount of $46,389.56, from which it claimed deductions of $45,534.10. For the fiscal year ended May 31, 1970, Harpeth Homes, Inc., reported gross rents of $47,167.39, from which it claimed deductions of $52,051.59.

In the partnership return of Hillside Manor Apartments, a partnership composed of the shareholders of Harpeth Homes, Inc., for the taxable year 1969, there was reported rental income of $18,107.18, from which there were deducted interest of $12,444.08 and depreciation of $11,845, resulting in a net loss of $6,181.90. The net loss was allocated among the partners, as follows:

| Partner | Loss |
|---|---|
| Laurence B. Howard, Jr. | $3,956.42 |
| Allan Murphy | 989.10 |
| Gerson Schklar | 989.10 |
| Maclin P. Davis, Jr. | 247.28 |
| Total | 6,181.90 |

Urban Manor East, Inc., filed its income tax returns on the basis of a fiscal year ended January 31. Urban Manor East Apartments, a partnership composed of the shareholders of Urban Manor East, Inc., filed its partnership income tax returns on the basis of a calendar year.

In its income tax return for the fiscal year ended January 31, 1970, Urban Manor East, Inc., reported gross rents from Urban Manor East Apartments in the amount of $54,966.21, from which it claimed deductions of $56,184.34.

In the partnership return of Urban Manor East Apartments, a partnership composed of shareholders of Urban Manor East, Inc., for the taxable year 1969, there was included rental income of $21,247, from which there were deducted depreciation, interest, and other expense of $59,928. The resulting loss was allocated among the partners, as follows:

| Partner | Loss |
|---|---|
| Laurence B. Howard, Jr. | $4,177.80 |
| Laurence B. Howard, Jr., Adm. Estate of Nancy C. Howard | 7,427.20 |
| Triangle Construction Co. | 11,604.00 |
| Allan Murphy | 11,604.00 |
| Maclin P. Davis, Jr. | 3,868.00 |
| Total | 38,681.00 |

Bedford Manor, Inc., filed its income tax returns on the basis of a fiscal year ended September 30. Bedford Manor Apartments, a partnership composed of the shareholders of Bedford Manor, Inc., filed its partnership income tax returns on the basis of a calendar year.

In its amended income tax return for the fiscal year ended September 30, 1969, Bedford Manor, Inc., reported gross rents from Bedford Manor Apartments in the amount of $44,021.87, from which it claimed deductions of $43,980.95. For the fiscal year ended September 30, 1970, Bedford Manor, Inc., reported gross rents of $129,867.10, from which it claimed deductions of $137,607.12.

In the partnership return of Bedford Manor Apartments, a partnership composed of the stockholders of Bedford Manor, Inc., for the taxable year 1969, there was reported rental income of $16,253, from which there were deducted depreciation, interest, and other expenses of $104,901. The resulting loss of $88,648 was allocated among the partners, as follows:

| Partner | Loss |
|---|---|
| Laurence B. Howard, Jr. | $21,401 |
| Laurence B. Howard, Jr., Adm. Estate of Nancy C. Howard | 37,993 |
| Triangle Construction Co. | 13,297 |
| Allan Murphy | 8,865 |
| Maclin P. Davis, Jr. | 7,092 |
| Total | 88,648 |

The foregoing returns were prepared on the basis that the corporations should report all income from rents, deducting therefrom operating expenses and the amounts paid for interest and amortization of the loans. The amounts paid on account of the loans were reflected as gross rents on the returns of the partnerships. From these amounts, there were deducted interest and depreciation, together with any incidental expenses incurred by the partnerships.

OPINION

In these cases, there is presented a familiar pattern involving the construction of rental housing, pursuant to programs initiated by the Federal Housing Administration, with financing to be provided in the name of a corporation formed for that purpose, and with whatever interest may have remained in the property to be transferred to designated individuals as partners or coowners in order that such individuals may have the benefit of the deductions attributable to ownership of the property. Accordingly, petitioners contend that the result is controlled by the opinion of this Court in *David F. Bolger,* 59 T.C. 760 (1973).[2]

The respondent concedes that under Tennessee law, an unrecorded quitclaim deed is effective to transfer all of the grantor's right, title, and interest in such property to the grantee. Accepting this, respondent argues that due to the restrictions imposed by the regulatory agreements, which were required in order to obtain the financing of these properties, the transfers were lacking in reality. Similar restrictions were imposed by the lenders in the *Bolger* case. The mere fact that any transfer was subject to the approval of the FHA does not preclude an effective transfer being made prior to such approval. *Howard R. Ward,* 48 T.C. 803 (1967); see also *William T. Male,* T.C. Memo. 1971-301, affd. per curiam 473 F.2d 908 (4th Cir. 1973).

The respondent points to the fact that in the filing of the returns for the corporations and the respective partnerships involved in this proceeding, petitioners adopted a "bizarre" method of accounting for the gross rents. It is impossible from the record to determine whether such method, though patently erroneous, produced a result different from that which would follow if all income and expenses were reflected in the petitioners' returns. If not, respondent could and should have made the necessary adjustments.

The respondent further argues that the transfers were lacking in substance because the primary or sole purpose for the granting of the quitclaim deeds was to transfer to the individual partners the deduction of losses which would be incurred on account of interest and depreciation. While the respondent's argument may

---

[2] The facts are distinguishable from *William B. Strong,* 66 T.C. 12 (1976), in that there the property in question was not formally transferred to the individuals by quitclaim deed.

be factually correct, the fact that the transfers were motivated by tax considerations does not afford a basis for distinguishing the *Bolger* case. In fact, the result sought to be achieved by the petitioners here is in accord with the intent of the Congress.[3]

As this Court pointed out in the *Bolger* case, our decision must turn on the question whether, by the quitclaim deeds, the grantees acquired a sufficient interest in the properties to warrant the deduction by them of depreciation and mortgage interest. The parties have agreed that under Tennessee law an unrecorded quitclaim deed is sufficient to transfer an interest in property to the grantee.

A simple transfer by .quitclaim deed pursuant to which the grantees might take the property subject to (but not assuming) the obligations imposed in the regulatory agreements would presumably vest in the grantees ownership of the fee and all rights incident thereto. The grantor corporation would become a mere "shell" or nominee. Gross rents would be chargeable in the first instance to the grantees, from which would be deductible all expenses attributable to the properties, including management fees, depreciation, and interest.

If all we had was a naked quitclaim deed, the result might well be governed by our decision in the *Bolger* case. If so, it would also follow that gross rentals would likewise be chargeable to the grantees. In this case, however, the quitclaim deed was restricted by agreement between the grantors and the grantees. The grantees were apparently unwilling to assume responsibility of accounting for the gross rents.[4]

The terms of the agreements have been set forth in our findings. As construed by the parties, the gross rents from the properties accrued to the corporate grantors. The obligation to make the payments on the indebtedness, both with respect to principal and interest, remained that of the corporate grantors. Any so-called "residual receipts" which could not be paid out were to be retained by the corporate grantors. All that the

---

[3] In a report entitled "Overview of Tax Shelters," prepared by the Joint Committee on Internal Revenue Taxation for the use of the Committee on Ways and Means, dated Sept. 2, 1975, at 18, n.1, the following is noted:

"'The 'pure' tax shelter available to subsidized low-income housing under section 236 of the National Housing Act reflected in fact a deliberate congressional reliance on the use of nonrecourse loans to create tax losses whose shelter effect would add to the investors' profits."

[4] In *David F. Bolger,* 59 T.C. 760, 763 (1973), the transferees actually entered into an assumption agreement.

petitioners acquired was the right to receive the payout of "surplus cash" defined as "the maximum amount allowed to be paid out by the FHA" pursuant to the regulatory agreement. As stockholders of the corporate grantors, petitioners already had that right. The quitclaim deeds merely gave the stockholders the security of a direct claim on the funds available for distribution.

The burden was on the petitioners to show that the retention of "residual receipts" by the corporate grantors was *in substance,* as well as *in form,* a management fee. Petitioners failed to meet this burden.

When the quitclaim deeds are thus considered in light of the agreement between the parties, restricting the rights to be acquired pursuant to those deeds, it cannot be said that petitioners acquired a depreciable interest in the properties. Their interests remained those of a stockholder, entitled only to the payout of "surplus cash" in accordance with the regulatory agreements. If petitioners had intended to acquire a greater interest than that, it is clear that they could and would have done so. For the taxable year 1973, two of these properties were reconveyed to a new partnership. The reconveyance was approved by the FHA and the grantee partnerships assumed the obligations of the corporate grantors under the regulatory agreements.

*Decision will be entered for the respondent.*