585 F.2d 807
 78-2 USTC P 9776
 Maclin P. DAVIS, Jr., and Dorothy S. Davis, Laurence B.
Howard, Jr., and Corneille T. Howard, Allan Murphy
and Estate of Marion E. Murphy by Allan
Murphy, Executor, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
 No. 76-2283.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 9, 1978.
Decided Oct. 27, 1978.
 
 H. Stennis Little, Jr., Little, Thrailkill & Owen, John B. Owens, Jr., Nashville, Tenn., for appellants.
 Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Timothy B. McBride, Tax Div., U. S. Dept. of Justice, Washington, D. C., Meade Whitaker, Chief Counsel, I.R.S., Washington, D. C., for appellee.
 Before EDWARDS and KEITH, Circuit Judges, and PECK, Senior Circuit Judge.
 PECK, Senior Circuit Judge.
 
 
 1
 Petitioners-appellants, who are the taxpayers in the present case, have perfected this appeal from a decision of the Tax Court, which has held that the taxpayers could not legally deduct losses arising from the ownership and operation of apartment buildings and thus were liable, as had been determined by respondent-appellee Commissioner, for income tax deficiencies for the taxable year 1969, when the losses had been taken. Davis, et al. v. Commissioner, 66 T.C. 260 (1976). We affirm.
 
 
 2
 * The present case arises out of the Commissioner's disallowance of what the taxpayers contend to be a legitimate real estate tax shelter. A more detailed statement of facts than provided in this opinion is reported in the Tax Court opinion. Davis, et al. v. Commissioner, supra, 66 T.C. at 261-69.
 
 
 3
 Harpeth Homes, Inc. was incorporated on July 6, 1966, for the purpose of constructing, developing, and operating an apartment complex to be known as Hillside Manor Apartments. Similarly, Bedford Manor, Inc. and Urban Manor East, Inc. were incorporated on December 11, 1967, for the purpose of constructing, developing, and operating, respectively, the Bedford Manor Apartments and the Urban Manor East Apartments. Taxpayers owned, in varying proportions, the stock of these three Tennessee corporations.[1]
 
 
 4
 On July 26, 1966, Harpeth Homes, Inc. obtained a mortgage loan to finance 100 percent of the construction costs of the apartment complex that it intended to construct, develop, and operate. In addition, Harpeth Homes, Inc. executed a regulatory agreement with the Federal Housing Administration (FHA) under which the FHA insured the mortgage loan. Likewise, on January 18, 1968, Bedford Manor, Inc. and Urban Manor East, Inc. obtained mortgage loans to finance 100 percent of the construction costs of the apartment complexes that those two corporations intended to construct, develop, and operate, and also executed regulatory agreements with the FHA under which the FHA insured their loans.
 
 
 5
 The restrictions and obligations in the FHA regulatory agreements were quite similar in all three cases.[2] Each FHA agreement provided that as security for the FHA's insurance of the mortgage, the mortgagor corporation would assign and pledge to the Federal Housing Commissioner the rights of the mortgagor corporation to the rents, profits, incomes, and all other charges from the mortgaged property; permission was given by the FHA to the mortgagor corporation to collect and retain such rents, profits, income, and other charges unless and until a default be declared. Each FHA agreement also provided that written approval of the Federal Housing Commissioner was required to: (1) adopt rent schedules; (2) to convey, transfer, or encumber the rental properties; (3) to assign, transfer, or encumber any personal property of the project, including rent; (4) to pay any funds unless for reasonable operating expenses and necessary repairs; (5) to distribute funds to owners unless from "surplus cash" and unless limited to 6 percent of the equity investment per annum; (6) to contract for supervisory or managerial services; and (7) to undertake any other business activity by the mortgagor corporation. The agreements defined "surplus cash" as the cash remaining after subtracting (1) payments of amounts due on the mortgage and on all other obligations of the apartments, (2) deposits made to reserves, and (3) segregation of special funds and tenant security deposits. "Residual receipts" were defined as cash remaining after the payment of the unrestricted distribution from surplus cash. Because prior written approval of the Federal Housing Commissioner was required for any distribution of surplus cash that exceeded 6 percent of the equity investment per annum, prior written approval of the Federal Housing Commissioner was, of course, required before any "residual receipts" could be distributed.
 
 
 6
 Following the execution of these financing arrangements, the apartment complexes were in fact constructed, developed, and put into operation by the corporations. Taxpayers then apparently decided that there was a distinct disadvantage to the corporate ownership of the apartment complexes. The losses anticipated from the first years of the operation of the apartments would not accrue to the taxpayers as shareholders, because as shareholders they could not take those corporate losses to offset portions of their individual incomes. Rather, the anticipated losses would accrue solely to the corporations, which had in this case no other income that the losses could offset.
 
 
 7
 Consequently, taxpayers sought to obtain ownership of the apartment complexes while retaining the advantages of the corporate structuring. The three corporations each entered into an "Agreement" with its shareholders, on September 18, 1968, in the case of Bedford Manors, Inc. and Urban Manor East, Inc., and on January 28, 1969, in the case of Harpeth Homes, Inc. In all three cases, the "Agreement" (hereinafter called the transfer and management agreement) provided that the grantor corporation would transfer title to the grantee shareholders (the taxpayers) and that grantor corporation would thereafter manage the apartments, assuming such responsibilities as collecting rents, maintaining and repairing the apartments, and paying the debt charges, taxes, and insurance premiums. In addition, however, each transfer and management agreement included provisions that seemed inconsistent with the status of the corporation as a mere managing agent for the grantee shareholders. The grantor corporation was to remain liable on the mortgage note; the grantee shareholders were not to be liable for payment of the mortgage note; the FHA regulatory agreement was to remain in full force and effect without impairment of any of the obligations of the grantor corporation; and the grantor corporation was to pay the grantee shareholders the amount of the surplus cash permitted to be paid under the FHA regulatory agreement while keeping the residual receipts for itself.[3]
 
 
 8
 In accordance with the transfer and management agreements, the apartment complexes were conveyed by quitclaim deeds to the shareholders (the taxpayers) as tenants in common, with interests in proportion to the stock ownership of each shareholder. The consideration for passing title under each deed was $10 and "other good consideration." At the time of the conveyances, the fair market value of each of the apartment properties was at least equal to its outstanding mortgage liabilities.[4] The quitclaim deeds were not recorded.
 
 
 9
 The FHA was told of the conveyances of the properties by the corporations, but taxpayers did not request FHA approval. In October, 1969, the Area Director of the FHA did write to taxpayer Maclin P. Davis, stating that the FHA did not anticipate any objection to retroactive approval of the transfer of the properties but adding that the FHA did take cognizance of the fact that the taxpayers had ignored the FHA regulatory agreement.
 
 
 10
 In 1969, the apartment complexes were operated pursuant to the transfer and management agreements; the corporations subcontracted with third parties to provide the actual management services. On the income tax returns of the corporations, all gross rents from the properties were reported and most of the operating expenses were claimed as deductions. One deduction was called various names: "management fees," "fees paid to tenants in common," or "rental on apartment property." In reality, these "fees" were not fees at all but were the payments on the mortgage loans. After accounting for income and expenses, the corporations all reported losses in 1969 and hence did not make any actual distributions of funds to taxpayers because there was no "surplus cash."
 
 
 11
 Taxpayers, in addition to filing individual returns, filed a partnership return for each of the apartment complexes. On the partnership returns, the so-called "fees" (the payments on the mortgage loans) were reported as rental income against which the partnership deducted the interest portion of the loan payments made by the corporation and the depreciation on the apartment properties.[5] In 1969, all three partnership returns reported net losses, which were allocated among the taxpayers as partners. The taxpayers in turn reported their portion of the partnership losses on their income tax returns, deducting those amounts from their incomes.
 
 
 12
 In January, 1974, appellee Commissioner issued notices of deficiencies to taxpayers and notices of partnership audit changes. In the deficiency notices, taxpayers were informed that the Commissioner had disallowed the amounts taken by the taxpayers in 1969 as loss deductions. In the notices of partnership audit changes, taxpayers were informed that the partnerships could not claim any income and expenses, and the losses that had been allocated among the individual taxpayers were disallowed. The Commissioner stated in the notices that the arrangements between the corporations and its shareholders (the taxpayers) was a sham, noting that the individual taxpayers had taken the benefit of the loss deductions while the corporation continued to bear the burdens of ownership of the properties.[6] Taxpayers sought review in the Tax Court.
 
 
 13
 Taxpayers argued in the Tax Court that this case involved a quite legitimate arrangement of financial responsibilities and property interests for the construction, development, and operation of rental housing insured by the FHA. They denied that there was any legal problem under the tax law for the financing to be provided to a corporation formed for the purpose of constructing, and developing rental housing and, once the rental housing was constructed, for the equity interest in the housing to be transferred by quitclaim deed (which would be effective under state law to transfer the ownership interest) to the taxpayers as tenants in common in order that the taxpayers could have the benefit of the deductions attributable to the property. The taxpayers' understanding of the law was that their arrangement had been previously upheld in the Tax Court in Bolger v. Commissioner, 59 T.C. 760 (1973), and that as a result they had the right to take the loss deductions.
 
 
 14
 In Bolger v. Commissioner, supra, the Tax Court did in fact hold that the transfer of the ownership interests of a group of corporations in depreciable properties, which were subject to leases and mortgage indebtedness, to the corporations' shareholders was effective to grant to those shareholders the ownership interests in the properties such as to support the taken depreciation deductions. While the taxpayers rely heavily on Bolger, and the Commissioner went to some lengths in attempting to distinguish it, the Tax Court adopted a different line of analysis in disallowing taxpayers' loss deductions. According to the Tax Court, the proper question to ask in this case was "whether, by the particular deeds, the grantees acquired sufficient interest in the properties to warrant deduction by them of the depreciation and mortgage interest." 66 T.C. at 271. The Tax Court concluded that there was not such a transfer because "the quitclaim deed was restricted by agreement between the grantors and the grantees." 66 T.C. at 271. The Tax Court stated:
 
 
 15
 (According to the terms of the agreements) as construed by the parties, the gross rents from the properties accrued to the corporate grantors. The obligation to make the payments on the indebtedness, both with respect to principal and interest, remained that of the corporate grantors. Any so-called "residual receipts" which could not be paid out were to be retained by the corporate grantors. All that the petitioners acquired was the right to receive the payout of "surplus cash" defined as "the maximum amount allowed to be paid out by the FHA" pursuant to the regulatory agreement. As stockholders of the corporate grantors, petitioners already had that right. The quitclaim deeds merely gave the stockholders the security of a direct claim on the funds available for distribution.
 
 
 16
 66 T.C. at 271-72. The Tax Court thus held that no property interest passed to the taxpayers as shareholders because under the transfer and management agreement the corporations continued to be the real owners of the apartment complexes. Taxpayers sought review in this Court.
 
 II
 
 17
 This Court in Owens v. Commissioner, 568 F.2d 1233 (6th Cir. 1977) at 1237, acknowledged that under Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), at 469, 55 S.Ct. at 267, "(t)he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted," but then pointed out the limitation that the Gregory case itself places on that right. According to Gregory, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." 293 U.S. at 469, 55 S.Ct. at 267. See Knetsch v. United States, 364 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). What tax statutes do not intend is that taxpayers cast transactions in forms so as to come within their provisions when in fact there is no substance behind the use of the forms, when the transaction is but a sham, or when the economic reality of the transaction does not comport with the form. Gregory v. Helvering, supra, 293 U.S. at 469, 55 S.Ct. 266; Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Owens v. Commissioner, supra, 568 F.2d at 1237; Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), Cert. denied, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967).
 
 
 18
 In the present case, the Commissioner's determination of deficiencies rested upon the ground that the taxpayers' arrangements with their corporations were shams. The burden was thus on the taxpayers to prove that their transfer and management agreements were not shams. "It is established that the Commissioner's determination of deficiencies is presumed correct and the taxpayer has the burden of proof of showing it to be otherwise." Coomes v. Commissioner, 572 F.2d 554 (6th Cir. 1978). See Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Owens v. Commissioner, supra, 568 F.2d at 1238. Taxpayers in this case have not carried the burden of proving that the Commissioner was incorrect in his determinations with respect to them.[7]
 
 
 19
 The arrangements taxpayers had with their corporations were one-sided to the advantage of the taxpayers. In absence of proof to the contrary, we must presume that this was due to the fact that the parties were corporations and their controlling shareholders. Corporations dealing at arm's length would not have made these deals.[8] With minimal investment, consisting of a few dollars and a contingent need to pay the mortgage in order to keep the property, taxpayers purported to acquire from the corporations the ownership of the apartments and thereby the right to claim interest and depreciation deductions worth tens of thousands of dollars, creating loss deductions to "shelter" other income of theirs.
 
 
 20
 The one-sided character of the arrangement before us can be seen in a different way. Normally, such arrangements are financing tools for businesses owning income-producing property. Cary, "Corporation Financing through the Sale and Lease-Back of Property: Business, Tax, and Policy Considerations," 62 Harv.L.Rev. 1 (1948). In this case, however, the corporations did not obtain a sum of money under the transfer and management agreements. Even before the transfer, the corporations had the right to any income produced by the properties.
 
 
 21
 The transfer and management agreements thus could not have been intended to achieve an arm's-length business arrangement, but rather were executed to obtain an advantageous tax situation for taxpayers. See May v. Commissioner, 41 P-H T.C.Memo P 72,070 (Tx.Ct.1972) (depreciation deduction denied because taxpayer had no interest in television films; transaction never intended to achieve an arm's-length sale and purchase of films, but rather an advantageous tax situation). Under Gregory v. Helvering, supra, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, they were transactions not intended by the loss deduction provision to alter tax liability. Therefore, the claimed loss deductions must be denied and the Commissioner's determination of deficiencies upheld. See Southeastern Canteen Co. v. Commissioner, 410 F.2d 615, 619-20 (6th Cir.), Cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). The Commissioner's power under § 482 of the Internal Revenue Code of 1954, 26 U.S.C. § 482, to reallocate income and deductions between businesses owned by related parties reinforces this conclusion.[9] The regulations under that section recognize that such reallocation is appropriate when there is a lack of an arm's-length deal involving related parties.[10]
 
 
 22
 This result is supported by a line of similar cases that involved sale-and-leasebacks between related parties and that the courts called shams. These cases hold that when a transfer is made between related parties and has no utilitarian business purpose, in reality there has been simply a camouflaged assignment of income and the arrangement must be disregarded for tax purposes. Mathews v. Commissioner, 520 F.2d 323, 324-25 (5th Cir. 1975), Cert. denied, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976); W. H. Armstron v. Commissioner, 188 F.2d 531, 533 (5th Cir. 1951); White v. Fitzpatrick, 193 F.2d 398 (2d Cir. 1951), Cert. denied, 343 U.S. 928, 72 S.Ct. 762, 96 L.Ed. 1338 (1952). This rule has been said to be supported by the principles governing intramarital transfers of income. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); White v. Fitzpatrick, supra, 193 F.2d at 401. In Clifford, the Supreme Court held that a husband who had assigned securities to a trust, the net income of which was to go to his wife, was to be taxed on the income of the trust because his control of the trust was such that he owned, for tax purposes, the securities in the trust. A "manager," who retains such control over the estate in a situation when there is business purpose lacking is like the husband in Clifford, the real owner of the property.
 
 
 23
 The difference between these cases and the one before us is that at stake here is the assignment of losses instead of the assignment of income. The controlling parties, the taxpayers, wanted ownership status in order to get the benefit of loss deductions, whereas in sale-and-leaseback cases involving related parties and the lack of business purpose, the controlling parties wanted lessee status in order to get the benefit of deductions from income. In both situations there is the lack of arm's-length dealing. See Mathews v. Commissioner, supra, 520 F.2d 325. It is just that in the present case, the taxpayers used their control of the situation to transfer title by a deal that placed all the burdens of ownership on the corporations while keeping tax benefit for themselves.
 
 III
 
 24
 Two cases, Frank Lyon Co. v. United States, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), and Bolger v. Commissioner, supra, 59 T.C. 760, at first blush appear to reach a result inconsistent with ours. However, while both cases present similar circumstances in many respects, they are factually and legally distinguishable from the present case.
 
 
 25
 In Frank Lyon Co. v. United States, supra, the Supreme Court faced a complicated set of facts. Worthen Bank & Trust Company wished to have a building constructed for its banking business. As a consequence of state and federal regulation, Worthen was forced to use a sale-and-leaseback arrangement in order to raise the funds necessary for the construction of the building. Worthen, taxpayer Frank Lyon Co., First National City Bank, and New York Life Insurance Company executed complementary and interlocking agreements. The bank building was sold by Worthen to taxpayer Lyon as it was constructed. The land on which the building stood was leased by Worthen to Lyon. Worthen leased back from Lyon the completed building under a "net lease." City Bank provided the financing to taxpayer Lyon for the construction of the building, and New York Life was to become the permanent lender by purchasing the mortgage note from City Bank.
 
 
 26
 It happened that under these agreements the sum stated to be rent payments on the building over the term of the lease equalled the principal and interest payments that would amortize the New York Life mortgage loan over the same period of time. The Commissioner disallowed the interest and depreciation deductions that taxpayer Lyon took as the purported owner of the bank building on the ground that taxpayer Lyon was not the owner for the purposes of the tax law. The Eighth Circuit agreed with the Commissioner.
 
 
 27
 The Supreme Court reversed, holding that taxpayer Lyon was entitled to the deductions as the owner of the building. The Supreme Court determined that the substance of the transaction was a bona fide sale-and-leaseback.
 
 
 28
 There is a superficial similarity in the present case to the Frank Lyon Co. case. In both cases, the payments were equal to the discharge of the mortgage indebtedness on the property. The very reasons that the Supreme Court gave in Part III of its opinion, 98 S.Ct. 1299-1302, supporting its conclusion in that case, however, clearly distinguish the case from the one before us.
 
 
 29
 First, the Supreme Court noted that it was taxpayer Lyon alone, and not Worthen, which was liable on the mortgage note to New York Life. In the words of the Supreme Court:
 
 
 30
 Here . . . and most significantly, it was Lyon alone, and not Worthen, who was liable on the notes, first to City Bank, and then to New York Life. Despite the facts that Worthen had agreed to pay rent and that this rent equalled the amounts due from Lyon to New York Life, should anything go awry in the later years of the lease, Lyon was primarily liable. No matter how the transaction could have been devised otherwise, it remained a fact that as the agreements were placed in final form, the obligation on the notes fell squarely on Lyon. Lyon, an ongoing enterprise, exposed its very business well-being to this real and substantial risk.
 
 
 31
 The effect of this liability on Lyon is not just the abstract possibility that something will go wrong and that Worthen will not be able to make its payments. Lyon has disclosed this liability on its balance sheet for all the world to see. Its financial position is affected substantially by the presence of this long-term debt, despite the offsetting presence of the building as an asset. To the extent that Lyon has used its capital in this transaction, it is less able to obtain financing for other business needs.
 
 
 32
 98 S.Ct. at 1300. In contrast, in the present case, the taxpayers were not liable on the notes to the lenders, either on a recourse or non-recourse basis. The corporations alone were the liable parties.
 
 
 33
 Second, the Supreme Court noted that the accounting treatment in the case before it was consistent with a sale-and-leaseback. The Supreme Court acknowledged that accounting descriptions did not give substance to what had no substance, but then pointed out that the use of accepted accounting methods in accordance with the form of the agreement gave the transaction a meaningful character because the parties understood the accounting treatment to be appropriate for a sale-and-leaseback. Again in contrast, the accounting treatment in the present case was not employed by the parties as the appropriate method to account for a sale-and-leaseback. Here the accounting treatment only served to confuse matters.
 
 
 34
 Finally, the Supreme Court noted that there were independent parties involved in the case before it and that these parties had negotiated at arm's length. The sale-and-leaseback agreement between Worthen and taxpayer Lyon was a product of those arm's-length dealings, not of collusion with the sole design of cutting taxes. That the agreement between Worthen and Lyon involved tax planning did not bother the Supreme Court because Worthen and Lyon were independent parties. It is pertinent here to quote the Supreme Court's language in Frank Lyon Co. on the independent status of the parties.
 
 
 35
 Lyon is not a corporation with no purpose other than to hold title to the bank building. It was not created by Worthen or even financed to any degree by Worthen.
 
 
 36
 98 S.Ct. at 1302. In contrast, in the present case the taxpayers and the corporations were not independent parties. Taxpayers controlled the corporations.
 
 
 37
 In light of these clearly distinguishing points, the Frank Lyon Co. case is not support for the taxpayers in the present case. In fact, it may not be inaccurate to suggest that the true relevance of the Frank Lyon Co. case here is that none of the factors enumerated by the Supreme Court in Frank Lyon Co. for upholding a sale-and-leaseback arrangement were present in the situation before us. At this deeper level of analysis, Frank Lyon Co. supports this Court's decision in the present case.
 
 
 38
 The Tax Court's case Bolger v. Commissioner, supra, 59 T.C. 760, is not quite so easily distinguishable as Frank Lyon Co. In Bolger, ten corporations acquired desired properties and in each case a net lease arrangement was subsequently made with a manufacturing or commercial concern interested in the use of the particular property. The corporations then sold all of their notes, in an amount equal to the purchase price of the property it had acquired, to institutional lenders, which would be secured by a first mortgage and an assignment of the lease. The mortgage notes included provisions for the payment of the mortgage over a period equal to the term of the lease, for the corporation to maintain its existence and to refrain from any business activity except that which arose out of the ownership and leasing of the property and for the payments by the lessees on the leases to be made directly to the mortgagee in satisfaction of the secured notes.
 
 
 39
 After the lease and mortgage arrangements were made, the corporations conveyed the property to the shareholders for "one dollar and other consideration." In accordance with the terms of the mortgage agreement, the transferee shareholders executed an assumption agreement in favor of the corporation, promising to assume all of the corporation's obligations under the lease and the mortgage, although on a non-recourse basis. The taxpayer-shareholder Bolger participated in this scheme and on his income tax returns for a four year period took his share of the income and deductions as a co-owner of the properties. The Commissioner, however, disallowed the depreciation deductions taken by the taxpayer Bolger, who appealed to the Tax Court. There it was determined that the corporations were all viable entities both before and after the transfer of the properties and hence had to be treated as separate entities and that the corporations had transferred what ownership interests they had to their shareholders.
 
 
 40
 Despite many similarities to the present case, Bolger is distinguishable on the same grounds that the Supreme Court enumerated in Frank Lyon Co. for upholding sale-and-leaseback treatment. The first distinction between Bolger and the present case is that in Bolger the taxpayer-shareholder assumed the mortgages under the agreements that transferred the properties from the financing corporations. Here the mortgage liabilities were not assumed. While it may be true that the Bolger taxpayer and his fellow shareholders did not assume the mortgage on a recourse basis, still it was the Bolger taxpayer and his fellow shareholders who would be normally paying the mortgage. In the present case, the transfer and management agreements provided that the corporations make the payments.
 
 
 41
 Second, the Bolger taxpayer accounted for the income and expenses of his interest in the buildings in accordance with his claimed interest; the Bolger taxpayer adopted an accounting method that reflected his intention that he be treated as an owner of the properties. The accounting treatment adopted in the present case had the corporations and not the taxpayers reporting the gross income and expenses of operating the apartments when the taxpayers claimed that the corporations were merely their agents; questions therefore arose as to whether the corporations or the taxpayers owned the apartments.
 
 
 42
 Third, in Bolger, there was not an issue as to whether the substance of the agreements transferring the properties from the corporations to the shareholders were different from the form. Rather, the issue was whether the corporations in that case could transfer a present interest in the properties given the encumbrances in the assignments of leases and the mortgages. The Tax Court said yes. Here the issue was whether the corporations had transferred the ownership of the apartments in view of the agreements between the parties. Unlike the Bolger situation, there were questions raised as to whether the substance of the agreements comported with the form (which they did not) and whether there was a bona fide transfer.
 
 
 43
 Finally, in Bolger, there were a number of independent parties involved; the Bolger lessees were manufacturing or commercial concerns desiring to use the properties owned first by the financing corporations and then by the Bolger taxpayer and his fellow shareholders. There was not present a sham sale-and-leaseback arrangement between related parties, as there was in the instant case. While Bolger is closer to the case before us now than Frank Lyon Co., there are no problems with drawing a line between this case and Bolger, which in any event is not binding on us.
 
 
 44
 The decision of the Tax Court is affirmed. Each party is to pay his own costs.
 
 
 
 [1]
 The Tax Court found that at all material times during the lawsuit, the relative stockholdings of the corporations were as follows:
 Harpeth Bedford Urban Manor
 Stockholder Homes, Inc. Manor, Inc. East, Inc.
Laurence B. Howard, Jr......... 64%
Nancy Howard or
 Laurence B. Howard, Jr..................... 67% 30%
Gerson Schklar ................ 16%
Triangle Construction Co.................... 15% 30%
Allan Murphy .................. 16% 10% 30%
Maclin P. Davis ............... 4% 8% 10%
 ---- ---- ----
 Totals ..................... 100% 100% 100%
 Gerson Schklar and Triangle Construction Co. are not petitioners-appellants in this case. Nancy Howard died as a result of an automobile accident in 1968. She died intestate, and her shares went to Laurence Howard following the administration of her estate.
 
 
 [2]
 The same agreement form was used
 
 
 [3]
 For the provisions of these agreements, See Part IV of this opinion
 
 
 [4]
 Consequently, there will be no issue in this case as to what footnote 37 meant in Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947)
 
 
 [5]
 The Bedford Manors partners also reported $2,000 in management expenses and $44 in miscellaneous expenses. The Urban Manor partners reported $20 in miscellaneous expenses
 
 
 [6]
 In a letter dated March 19, 1970, taxpayer Maclin P. Davis wrote the following to Mr. Hatton Hardison:
 The only substantial economic advantage to owning these apartments is to use the losses resulting from depreciation, interest payments and other deductible expenses as deductions on the income tax returns of the individual owners.
 
 
 [7]
 The Tax Court was conscious of this problem, noting that Congress intended that there be a tax shelter for investors in low income rental housing. Davis, et al. v. Commissioner, 66 T.C. 260, 271 n.3 (1976). However, while it is true that Congress has appeared to approve the use of this shelter in order to attract investment, it does not follow that Congress has legislated the sham doctrine out of existence with respect to cases such as the one before us. Congress approved the taking of losses by owners of low income rental housing, not agreements that do not truly transfer ownership rights
 
 
 [8]
 This conclusion assumes that the corporations, while controlled by the taxpayers, could not be disregarded as separate entities under the tax laws. The corporations did, after all, have business purposes. The test in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-39, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), was therefore satisfied. See Burnet v. Commonwealth Improvement, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399 (1932); Bolger v. Commissioner, 59 T.C. 760 (1973). Compare Owens v. Commissioner, 568 F.2d 1233 (6th Cir. 1977)
 
 
 [9]
 Section 482 of the Internal Revenue Code of 1954, 26 U.S.C. § 482, provides:
 S 482. Allocation of income and deductions among taxpayers
 In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.
 Aug. 16, 1954, c. 736, 68A Stat. 162; Oct. 4, 1976, Pub.L. 94-455, Title XIX, § 1906(b)(13)(A), 90 Stat. 1834.
 
 
 [10]
 See Regulation 1.482-1(a)(6), which provides:
 (6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, the credits, the allowances, or the item or element of income, deductions, credits, or allowances, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).