**In the Matter of BALDWIN UNITED CORPORATION D.H. Baldwin Company, et al., Debtors.**

**D.H. BALDWIN COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 1–83–02495. Adv. No. 1–84–0110.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Feb. 15, 1985.

not available to Thompson, this claim of setoff     stands on no better footing than the others.

**58**

Alan Vogeler, Susan Grogan Faller, Martin Mooney, Frost & Jacobs, Cincinnati, Ohio, for plaintiff.

Matthew Yockshaw, Trial Attorney, Tax Div., Dept. of Justice, Washington, D.C., Nicholas J. Pantel, Asst. U.S. Atty., Cincinnati, Ohio, for defendant.

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 11 adversary proceeding is before the Court pursuant to its removal from the U.S. District Court for the Southern District of Ohio by agreement of the parties. The plaintiff, D.H. Baldwin Company ("Baldwin"), seeks recovery of an income tax deficiency and interest assessed for its 1976 tax year. A trial on the merits was held August 21 through 23, 1984. Two issues are presently before us, both arising from alleged deficiencies in 1976 reported gross income of the Baldwin Piano and Organ Company ("Piano Company"), a wholly-owned subsidiary of Baldwin which filed its 1976 corporate income tax return on a consolidated basis with the plaintiff. The first, known as the commissions issue, involves the question of whether under Internal Revenue Code ("IRC") § 482 Baldwin's 1976 reported gross income should have been increased by $725,-614 by virtue of alleged additional commission income to the Piano Company under a contract with the D.H. Baldwin Trust. The second, known as the installment accounts receivable issue, raises the question of whether under IRC § 482 Baldwin's 1976 reported gross income should have been increased by $640,195 attributable to collections in 1976 on certain installment sales contracts originally sold by the Piano Com-

pany to a group of banks and then repurchased by a Baldwin affiliate company. The remaining issues pending in this adversary proceeding were severed from this trial by our Order of August 20, 1984 (Court Doc. 50).

The Court hereby submits the following Findings of Fact, Opinion and Conclusions of Law. In our Findings of Fact we have incorporated the facts stipulated before the District Court where relevant.

## Findings of Fact

1. For all years relevant to this case, Baldwin and the Piano Company were both Ohio corporations with their principal places of business at the same address in Cincinnati, Ohio. The Piano Company was a wholly owned subsidiary of Baldwin in 1976, but has now been sold as part of the bankruptcy reorganization. (Final Pretrial Order, Rubin, C.J., at p. 4, Stipulation No. 1) (hereinafter "Stip.").

2. Baldwin and the Piano Company used the accrual method of accounting and, when available, the installment method of accounting for tax purposes. Baldwin and the Piano Company filed their income tax return on a calendar year basis (Stip. 2).

3. Pursuant to filing extensions granted to that date, on September 15, 1977 Baldwin filed a consolidated U.S. Corporation Income Tax Return (Treasury Form 1120) for the taxable year 1976, reporting therein income of the Piano Company. Such return reported a federal income tax liability of $1,704,670, the full amount of which was timely paid to the Internal Revenue Service ("IRS") (Stip. 3–4; Joint Ex. I).

4. On June 18, 1982 the IRS assessed a deficiency of $1,840,969 of income taxes against Baldwin and its consolidated subsidiaries for 1976, plus $932,399.34 of statutory interest thereon. After recalculation by the IRS, the amount of assessed statutory interest was reduced by $27,107.10. Baldwin timely paid the total so assessed to the IRS (Stip. 5).

5. On December 7, 1982 Baldwin filed a claim for refund of $1,293,674 of the assessed deficiency of income tax for 1976 plus the paid statutory interest attributable thereto plus interest thereon provided by law. The IRS denied such claim on December 30, 1982 (Stip. 6).

### Commissions Issue

6. The Baldwin Foundation ("Foundation"), created on May 20, 1961, is an Ohio nonprofit corporation which maintained its office at the same address with Baldwin and the Piano Company. The Foundation was formed under Ohio Revised Code ("ORC") § 1702.01 as a nonprofit corporation and constitutes a charitable corporation as defined by ORC § 1702.01(D). The Internal Revenue Service ("IRS") determined the Foundation to be a charitable organization under Internal Revenue Code ("IRC") § 501(c)(3). The IRS ruling of October 25, 1962 that made this determination remains in effect (Stip. 7, Joint Ex. II).

7. The trustees of the Foundation in the period from December 1, 1967 through 1976 were Lucien Wulsin, Jr., Morley P. Thompson, Robert Coghill, James M.E. Mixter, R.S. Harrison, Donald E. Waggoner, James E. Schwab, Philip Wyman, John F. Jordan, A.J. Schoenberger and J. Leland Brewster. During their period of service as trustees they were also officers or directors of Baldwin or the Piano Company (Stip. 8).

8. In an effort to achieve, *inter alia,* off balance sheet financing and a reduction in state and local income taxes for themselves, Baldwin and the Piano Company desired to enter into a contract with a third party for the sale of substantially all finished inventory of the Piano Company, to be consigned to the Piano Company's dealer network. Baldwin and the Piano Company also desired to produce revenue for the Foundation (Stip. 9, Tr. 149, 181).

9. On December 19, 1967 the D.H. Baldwin Trust ("the Trust") was formally created by agreement between the Foundation and Alan R. Vogeler, J. Leland Brewster and D. Michael Poast in their fiduciary capacity as the initial trustees. The Trust continues in existence to the present date (Stip. 10, Joint Ex. III).

10. All trustees of the Trust were appointed by the trustees of the Foundation, which had the right to remove any trustee upon thirty days' notice. (See, Joint Ex. III, Trust Agreement, Article V(A)). From 1967 through 1977 the Foundation had not removed any trustee of the Trust. From December 19, 1967 through 1976, the trustees of the Trust were Alan Vogeler (to March 31, 1968), J. Leland Brewster II (to December 31, 1968), D. Michael Poast (to March 31, 1968), Walter S. March (1968–70), Fred Lindsey (1968–1976), J. Tracy Kropp (1970–1976), Charles G. Lindeman (1971–1976), and Adam Bauer (1968–1973). None of the trustees of the Trust was an officer, director, or employee of the Piano Company or its parents or affiliates while serving as a trustee (Stip. 11).

11. While serving as trustees, Alan R. Vogeler and J. Leland Brewster were partners and D. Michael Poast an associate of the law firm of Kyte, Conlan, Wulsin & Vogeler, which in 1967 and 1968 represented Baldwin as principal attorneys. Prior to becoming trustees, Walter S. March and Fred Lindsey had been employed as vice presidents of Central Trust Company, a creditor of Baldwin at all times relevant. J. Tracy Kropp had been partner in charge of the Peat, Marwick, Mitchell & Co. office in Cincinnati, Ohio, the certified public accounting firm which audited Baldwin and its subsidiaries' books during the relevant time periods. Charles G. Lindeman had been employed previously as the controller of Baldwin. Adam Bauer had been employed previously as director of manufacturing of the Piano Company (Stip. 11).

12. On December 19, 1967, effective December 30, 1967, the Trust entered into a contract ("the contract") with the Piano Company to purchase all of the new pianos, organs, piano benches and accessories ("the inventory") then owned or thereafter manufactured by the Piano Company except for such items needed by the Piano Company to stock its own retail stores and for promotional, charitable or other business reasons. In 1972 the contract was amended to provide for the sale to the Trust of inventory consigned to the Piano

Company's retail stores. As used hereinafter "dealer" includes independent and company-owned stores (Stip. 13, Joint Ex. V, Second Amended Agreement, 1972 ("SAA")).

The Trust's only business activity in 1976 was the contract with the Piano Company; it had no employees (Tr. 225).

13. The Trust executed a credit agreement on December 28, 1967 with the Central Trust Company. With certain amendments from time to time a credit agreement remained in effect for the duration of the contract with the Piano Company (Stip. 12, Joint Ex. IV). The interest rate specified in the credit agreement was .5% over prime rate. This favorable rate is attributable to Baldwin and its subsidiaries being major customers of the Central Trust Company (Tr. 188–9).

The credit agreement required the Trust to provide the Bank with yearly certified audits of the Trust, Baldwin and the Piano Company (Joint Ex. IV, § 4(f), Tr. 190–1).

As part of the Trust's credit arrangements Baldwin adopted a resolution guaranteeing full performance by the Piano Company of its obligations under the contract with the Trust (Def. Ex. E–1–3, Tr. 187–8).

14. The contract called for the Trust to purchase items of inventory from the Piano Company at the prices specified in "Schedule B" to the contract and known as the "cost price" or factory billing price. The cost prices were the normal prices a manufacturer would charge for the sale of its product to a wholesaler. The price at which each item would be sold by the Trust to dealers, known as the "wholesale price" or consignment price was also shown on Schedule B. The cost prices on Schedule B were subject to change by the Piano Company on reasonable notice to the Trust, and the wholesale prices were subject to change by the Trust upon reasonable notice to the Piano Company, subject however, to certain limitations (Joint Ex. V, SAA § 4).

15. For 1976, the contract between the Piano Company and the Trust was imple-

mented as follows: the Piano Company manufactured the inventory and sold it to the Trust at the cost prices in effect on Schedule B. At this time, the Piano Company reported in its gross profit the difference between its cost of goods sold and the prices for which they were sold (Stip. 16).

The total price at which the Piano Company sold merchandise to the Trust in 1976 was $52,736,956. The total sales of the Piano Company for 1976 were $58,456,111 upon which the Piano Company had a gross profit of $14,965,505 and net profit of $8,307,982 (14.212% of sales). Such profits were reported in its 1976 income tax return (Stip. 23).

16. The Trust did not take physical possession of the inventory it purchased or make any physical alterations to it. Instead, the inventory was consigned to dealers by the Trust and delivered directly to them from the Piano Company. If a dealer sold an item of inventory to a consumer for cash, the dealer bought the item of inventory from the Trust at the "wholesale price" on Schedule B. If the dealer arranged the sale on the installment plan using Piano Company financing, the Piano Company repurchased the item of inventory from the Trust and an installment contract was created between the consumer and the Piano Company. On installment sales through an independent dealer, the Piano Company paid the dealer a sales commission (Stip. 16, 17).

The contract between the Piano Company and the Trust also provided for the Piano Company to act as collection agent for the Trust in connection with cash sales made of Trust inventory (Stip. 24).

17. The agreement further provided for the employment by the Trust of the Piano Company as servicing agent for the Trust in its transactions with dealers, with the following responsibilities:

(a) Conducting periodic audits of goods owned by the Trust, wherever located, followed by prompt and full reporting of the results thereof.

(b) Handling all matters concerning the relationship between the dealer and the Trust.

(c) Establishing and operating an accounting system for all goods purchased by the Trust and all goods consigned to dealers.

(d) Handling all settlements with dealers for consigned goods sold to or by them, including particularly the collection of all monies becoming due by reason of such sales and remitting such monies to the Trust.

(e) Handling all customer complaints, inquiries and claims made by customers under the manufacturer's warranty.

(f) Handling all dealer complaints or disagreements under the Dealer Contract or Company Store Contract and execution of trust instructions with respect to such contracts.

(g) Removing consigned goods from the floor of any dealer who failed to comply with the terms of his Dealer Contract or Company Store Contract or who was terminated as a dealer.

(h) Maintaining insurance on all consigned goods for the account of the Trust and any bank or other financing institution or agency having an interest in the goods.

(i) Reporting to the Trust any information regarding or affecting the security of the merchandise on consignment (Stip. 15).

In consideration for the services provided to the Trust by the Piano Company as servicing agent, the contract between the Piano Company and the Trust required the Trust to pay the Piano Company "commissions" (Joint Ex. V, SAA § 11(b)).

18. The amount of commissions which the Piano Company received was based on total collections from dealers on cash sales of inventory. The contract provided for the Piano Company to receive as commissions for its services such part of the total collections as remained after deduction of:

(a) the aggregate "cost prices" of all items of inventory paid for by dealers during the month;

(b) the aggregate "cost prices" of all items of inventory which became old stock during the month;

(c) expenses reasonably incurred by the Trust in the ordinary conduct of its business including, but not limited to trustee's fees, cost of furniture and equipment, salaries of Trust employees, rent, interest on loans, amounts payable to Trustees, taxes and state law costs; and

(d) a reasonable profit.

A profit of one-tenth of one percent of the average aggregate cost prices of all goods held by the Trust during the month was deemed reasonable. (Joint Ex. V, SAA § 11(a) and (b)).

19. Prior to 1974, the Piano Company and the Trust had each used the First-In-First-Out ("FIFO") method for valuing inventory for tax purposes. Using the FIFO method of valuing inventory, sales of fungible inventory during a year are deemed to be of the oldest inventory first.

Effective for the year 1974, both the Piano Company and the Trust adopted the Last-In-First-Out ("LIFO") method for valuing inventory. Using the LIFO method, sales of fungible inventory during a year are deemed to be of the newest inventory first. In a period of rising prices of inventory, use of LIFO rather than FIFO will increase reported cost of goods sold and reduce reported taxable profits.

For the relevant taxable years, any taxpayer using a FIFO method could adopt a LIFO method for valuing inventory upon filing with the IRS notice of intention to do so (Form 970) and paying any taxes for the year of change and the year prior thereto (IRC § 472(d)). Both the Piano Company and the Trust timely filed such forms for 1974 (Stip. 18, 19).

20. For years in which a taxpayer employs a LIFO method of valuing inventory, a year-end adjustment of the books of the taxpayer of the inventory value must be made to reflect the difference between what the inventory value would be if a FIFO method had been employed. This difference is called a LIFO reserve. The Trust's year-end LIFO inventory reserve

adjustment for 1976 was in the amount of $725,614 (Stip. 20).

21. Testimony at trial indicated that the Trust's adoption of LIFO was discussed between a representative of the Piano Company, Charles Lewis from the D.H. Baldwin controller's office, trustees of the Trust, namely, Mr. Kropp and Mr. Lindeman and Mr. Mellott of Mellott and Mellott, the Trust's accountants. Mr. Lewis made a presentation regarding LIFO at a Trust meeting (Tr. 262–3). Mellott and Mellott prepared a memorandum dated January 21, 1975 strongly urging that the inventory valuation method used by the Trust be converted to the LIFO method effective for the year ended December 31, 1974 (Pl. Ex. 1). The memo states that "there will not be a material difference in income as a result of changing to LIFO since cost of sales will increase and commissions to the Baldwin Piano and Organ Company will decrease on a dollar for dollar basis." Among the advantages of LIFO outlined was improvement of cash flow to the Trust.

Mr. Lewis explained that implicit in the Trust's considering the adoption of LIFO was an agreement between the Piano Company and the Trust that the amount of commissions to be paid to the Piano Company under the contract would be determined by the Trust's LIFO cost of goods sold. For 1976, the amount the Trust actually paid for inventory to the Piano Company did not change from the "cost prices" shown on the Schedule B then in effect (Tr. 266). But the parties agreed that for purposes of computing commissions, the "cost price" used would be the Trust's reported cost of goods sold under the LIFO method of valuing inventory (Tr. 265–6, 271–3).

The parties did not amend the written contract to reflect this new manner of computing commissions (Tr. 255–6). The services performed by the Piano Company for the Trust were not reduced or changed as a result of the reduction in commissions to be paid to the Piano Company (Tr. 168).

Mr. Lewis further testified that the Piano Company was agreeable to receiving

reduced commissions as a result of the Trust's adoption of LIFO because the Trust would have additional cash to either purchase inventory from the Piano Company or to repay the Trust's indebtedness (and therefore reduce the interest expense component of the commissions formula) (Tr. 116, 260). He did not know whether these benefits to the Piano Company actually occurred (Tr. 260, 274).

22. Transactions between the Trust and the Piano Company were summarized on monthly settlement statements (Joint Ex. XVI). The Piano Company prepared these statements for review by the trustees and Mellott and Mellott (Tr. 103). The settlement statement for December 1976 shows a deduction for "LIFO reserve 12/31/76" in the amount of $725,614.89. The parties stipulated that the Trust received a credit of $725,614 from the Piano Company against its indebtedness to the Piano Company as reflected on the settlement sheet of December 31, 1976 (Stip. 21).

The 1976 accounting records of the Piano Company, in particular, Account No. 9295 "Commission on Trust" shows a gross figure of $6,194,330.88 at December 31, 1976. A "charge" of $725,614.89 is shown for December 31, 1976 for a reduced gross commission amount of $5,468,715.99 (Pl. Ex. 5, Tr. 157). Account No. 2080 "D.H. Baldwin Trust Account Receivables" shows a gross figure of $1,137,846.34 at December 31, 1976 with a "credit" of $725,614.89 to the Trust (Def. Ex. H–2). A "Journal Entry" dated 12/31/76 shows a debit to Account No. 9295 and a credit to Account No. 2080 each in the amount of $725,614.89, explained as "[r]ecord commission due D.H.B. Trust after offset for Trust LIFO inventory Adj [sic] at 12/31/76" (Def. Ex. H–1).

23. The Piano Company reported commission income of $5,841,616.29 for its 1976 tax year (Tr. 120, 156; Pl. Ex. 2). This was computed from the figures shown in Plaintiff's Exhibit 5, as follows:

| | |
|---|---|
| Gross Commissions (Account No. 9295, Tr. 157) | $6,194,330.88 |
| Trust's LIFO reserve adjustment | (725,614.89) |
| | 5,468,715.99 |
| Display Charges (Account No. 9210, Tr. 155) | $1,375,323.01 |
| | 54,757.56 |
| | 6,898,796.56 |
| Trust Expense (Account No. 9698, Tr. 156) | (40,334.09) |
| | 6,858,462.47 |
| Interest Expense (Account No. 9329, Tr. 153) | (1,016,846.18) |
| | $5,841,616.29 |

The IRS increased the reported gross income of the Piano Company by $725,614 by virtue of alleged additional commission income to the Piano Company. This increased the plaintiff's tax liability by $348,295 according to plaintiff's calculation and resulted in $345,130 in interest being paid (Tr. 329).

24. During 1976, the net earnings of the Trust amounted to $15,722 and the sum of $16,300 was paid directly to the Foundation (Stip. 25). As a result of the IRS adjustment for 1976 increasing the Trust's commission expense by $725,614, the Trust had a net operating loss in 1976 of approximately $710,000 (Tr. 123).

*Installment Accounts Receivable Issue*

25. As noted above, when an installment sale of an inventory item was procured by a dealer, the Trust sold the inventory item back to the Piano Company and an installment contract (installment account receivable) was created between the consumer and the Piano Company (Stip. 16, Tr. 285–86).

26. Installment contracts that the Piano Company held following an installment sale of a piano were assigned by the Piano Company to the Baldwin Finance Company (Joint Ex. XIX, Tr. 287).

27. In 1974 the Piano Company wanted to sell by December 31, 1974 its then existing installment contracts (and those discounted with Baldwin Finance Company). Thereafter, it could adopt the installment method of accounting for sales as permitted by IRC § 453(a) without incurring the

**64**

tax disadvantages prescribed by IRC § 453(c) for installment method taxpayers receiving payments on accounts already reported in income under the accrual method of accounting (Stip. 29, Tr. 292).

28. The Piano Company requested and on December 17, 1974 received a private letter ruling from the IRS that a proposed sale of installment contracts would constitute a bona fide sale. The ruling holds that the Piano Company could thereafter elect the installment method of accounting for sales of inventory and avoid collections on the contracts sold being taxable (Stip. 29, Joint Ex. VIII p. 3, Tr. 294–96).

The ruling from the IRS was based on a proposed contract with a group of banks headed by Continental Illinois National Bank and Trust Company ("Continental"). Under the contract, collections on the installment contracts would be made by the Piano Company as agent for the banks (Stip. 32, Joint Ex. VIII p. 1–2, Joint Ex. IX § 6, Tr. 295–96).

29. Prior to the sale of installment contracts to Continental, Baldwin Finance Company assigned its portion of such contracts to the Piano Company (Tr. 297–98).

30. On December 31, 1974 the Piano Company entered into an agreement with a group of banks headed by Continental (the "Agreement") for the sale of installment contracts. The installment contracts sold had a principal value of $18,385,311.42 and future interest payable of $4,793,094.81.

Under the Agreement, the sale price to Continental was $21,091,422. Of this amount, Continental held back 10% as a reserve, or $2,109,142.26 (Joint Ex. IX § 4(B), Pl. Ex. 9, Tr. 300–03).

31. The principal value and accrued interest on all installment contracts covered by the Agreement were reported in the Piano Company's gross income in 1973 and 1974 based upon the accrual method of accounting. In addition, gross profit of $2,706,111 (that is, the difference between the contract price with Continental and the principal balances on the installment contracts sold) was also included in the Piano Company's gross income in 1974 (Stip. 35, Pl. Ex. 9, Tr. 294, 303).

32. As of January 1, 1975, the Piano Company elected to report sales of inventory on the installment method of accounting (Stip. 36, Tr. 288–9).

33. The Agreement with Continental gave the Piano Company an option to repurchase any "defaulted installment contract" from Continental at a price equal to the contract's then unpaid contract balance—all amounts remaining to be paid on the installment contract, both interest and principal (Stip. 31, Joint Ex. IX).

A defaulted installment contract was defined as one on which any installment was past due in whole or in part for a period in excess of 90 days (Stip. 31, Joint Ex. IX § 1(D)).

34. If the Piano Company repurchased any defaulted installment contracts from Continental, any collections on such contracts would be includable in the Piano Company's gross income as received, even though the full amount of principal and accrued interest on the contracts had previously been included in its gross income for 1974.[1] The December 17, 1984 ruling from the IRS specifically holds that:

> Any Contracts which are repurchased by Piano from the Agent [Continental] will become part of its installment accounts receivable and will be treated, for Federal income tax purposes, as if the accounts were never sold.

---

1. The Defendant's post-trial brief explains that "while income which may have been previously included in gross income under the accrual method of accounting must be reported again as installments are collected, double taxation is prevented by Section 453(c)." That section provides for a credit in the year of the second income inclusion for the amount of the income tax already paid because of the prior inclusion of the same item in income. The problem however, is that "[m]ore tax is due from Baldwin on that income because it had more taxable income on a consolidated basis in 1976 than it reported in 1973 and 1974, and thus the tax credited from the prior years' inclusion of the installment income in income for tax purposes, does not equal the additional tax for 1976." (Court Doc. 60 p. 12 n. 5, p. 17.)

(Joint Ex. VIII, p. 3, Tr. 310–11)

35. If a defaulted installment contract[2] was not purchased from Continental, Continental could charge the entire unpaid contract balance against the 10% reserve (Stip. 31). If Continental charged a defaulted installment contract against the 10% reserve, any future collections on such defaulted installment contract were to be added to the reserve. The 10% reserve required by the Agreement was reduced proportionately as collections were made and was payable ultimately to the Piano Company (Joint Ex. IX § 11, Tr. 361–2).

Plaintiff believed it would be taxed a second time on collections added to the reserve, as though it had repurchased the contracts (Tr. 309–10). Plaintiff also believed that depletion of the 10% reserve by Continental's charging defaulted contracts against it would have jeopardized the Piano Company's credit relationship with Continental, particularly since at the time of the transfer to Continental a number of contracts were already at or near default (Tr. 305, 335). One means for avoiding these problems appeared to be for a third party to purchase the defaulted contracts from Continental (Tr. 310).

36. National Farmer's Union Service Corporation ("NFU") is an insurance holding company and a Delaware corporation, all of the outstanding common shares of which were owned by the Farmers Educational and Cooperative Union of America, a Texas nonprofit corporation (Stip. 26, Tr. 367–68).

37. As of December 12, 1973, Baldwin gained ownership of convertible, participating, cumulative preferred stock of NFU which could be converted into 90% of the outstanding common stock of NFU at any time until a certain date at which time conversion became mandatory. The preferred stock was previously held by Baldwin-Central, Inc., a wholly owned subsidiary of Baldwin, and the mandatory conversion date was January 1, 1975. After the preferred stock was reissued to Baldwin, the mandatory conversion date was postponed until after 1976 (Stip. 26).

Ownership of the preferred stock entitled the owner to 90% of the net earnings, if any, of NFU (Stip. 26, Joint Ex. VI.). The conversion of NFU preferred stock into common stock took place in January, 1978 (Tr. 322–3).

38. Baldwin's Form 10–K for its fiscal year ended December 31, 1976, filed with the Securities and Exchange Commission, states that:

Although The Farmers' Educational and Cooperative Union of America (National Farmers Union) owns 100% of the outstanding common stock of Service [NFU], Baldwin controls Service by virtue of its ownership of all of the four percent (4%) cumulative, convertible participating preferred stock issued by Service in 1970."

(Def. Ex. C p. E–8–9) See also, Def. Ex. B. p. 31.

39. There have been no allegations that the directors or officers of NFU during the requisite time period had any relationship to Baldwin or the Piano Company. The directors of NFU in 1974 through 1976 were individuals who were directors or officers of the various state farmers unions which owned common stock of NFU. The officers of NFU were appointed by the board of directors of NFU (Stip. 27, 28).

40. NFU did not file a consolidated federal income tax return with Baldwin or the Piano Company for 1976 or any year prior thereto (Stip. 37, Tr. 323).

41. In early January 1975, James Schwab, treasurer of Baldwin, telephoned Paul Huff, vice president and treasurer of NFU and its insurance subsidiaries, inquiring whether NFU had any interest in purchasing the defaulted installment contracts. The yield to be expected on the

---

**2.** During 1975, installment accounts receivable included in the Agreement in the amount of at least $1,947,196 fell into the category of defaulted contracts.

During 1976, installment accounts receivable included in the Agreement in the amount of $562,947 fell into the category of defaulted contracts (Stip. 33, 34).

investment was represented to be 14% or better, with an initial investment of $500,000 to $600,000. Mr. Huff decided that NFU would acquire the contracts (Tr. 370–373).

42. The purchase of defaulted installment contracts by NFU was done on a month-to-month basis. The Piano Company advised NFU of the total purchase price it was to pay to Continental for the acquisition of defaulted installment contracts. NFU wired funds directly to an account at Continental in an amount equal to the remaining principal and interest that was to be paid on the defaulted installment contracts (Tr. 315–6, 337–8, 373–4, 401–2, Pl. Ex. 3).

43. At the time NFU purchased the contracts, the Piano Company reimbursed NFU for the amount of unearned interest it had paid to Continental as part of the purchase price of the contracts. Subsequently, all collections of principal and interest on the contracts purchased from Continental by NFU were paid to NFU. Therefore, NFU's profit on the transaction consisted of the interest or "carrying charge" portion of the collections as well as the late charges collected on the contracts (Tr. 335–6, 352, 359–60, 371, Pl. Ex. 3). The Piano Company also reimbursed NFU for up to 10% of its original purchase of defaulted contracts which had ultimately become uncollectible (Tr. 319–21).

44. The Piano Company acted as collection agent for NFU of the amounts collected on the installment contracts NFU purchased and received a service charge of $.50 per month per contract (Tr. 374, 382, Pl. Ex. 4).

During 1976, NFU was credited with $1,129,576 by the Piano Company from collections on installment contracts purchased from Continental (Stip. 38.).

45. Mr. Huff testified that the acquisition of the defaulted contracts was a profitable investment for NFU with a rate of return between 14 and 16 percent. This rate of return was calculated by measuring the principal balance of the notes, i.e., the amount invested, against the income from interest and late charges.

46. The understanding between the Piano Company and NFU regarding the purchase of installment contracts was not reduced to writing until 1977 and then only to satisfy the insurance examiners for the State of Utah (Tr. 375–6, Pl. Ex. 4).

47. NFU reported in its 1976 tax return the profits that it earned from the installment contracts (Tr. 387).

48. The Piano Company did not include in its gross income for 1976 collections from the defaulted installments purchased from Continental by NFU (Tr. 326).

49. The IRS increased the reported gross income of the Piano Company by $640,195 attributable to collections in 1976 on installment sales contracts purchased by NFU. This increased plaintiff's 1976 tax liability by $265,512 and resulted in interest of $263,099 being paid (Tr. 327).

### Opinion

### I. Commissions Issue

The plaintiff asserts that the IRS erred in increasing the Piano Company's reported gross income for 1976 by $725,614 in additional commission income. The IRS cites as authority Internal Revenue Code ("IRC") § 482, which in the case of two organizations controlled directly or indirectly by the same interests authorizes the IRS to allocate gross income between such organizations in order to prevent evasion of taxes or clearly to reflect income.

■ The first inquiry under § 482 is whether the Trust and Piano Company were controlled by the same interests:

> The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, or however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. Treas.Reg. § 1.482–1(a)(3).

While the control relationship in this case is not readily apparent because of the interposition of the Foundation between the Piano Company—a wholly owned subsidiary of Baldwin—and the Trust, all of these enti-

ties were subject to Baldwin's control. The Foundation's trustees were all officers or directors of Baldwin or the Piano Company. The Foundation's trustees appointed the trustees of the Trust.[3]

All of the Trustees of the Trust had a present or past relationship to Baldwin or the Piano Company. Moreover, the Trust was established for the express purpose of providing the Piano Company with a vehicle to sell its inventory, and only secondarily to provide revenue for the Foundation. Indeed, the Trust's only business activity was its contract with the Piano Company. These factors constitute sufficient evidence of direct or indirect control of the Trust by Baldwin to support a reallocation of income under § 482 to clearly reflect income or prevent evasion of taxes.

■ The standard to be applied under § 482 is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Treas.Reg. § 1.482–1(b)(1). The "agreement" for the Trust to adopt LIFO, with the Piano Company to accept reduced commissions, cannot withstand the test of arm's length dealings. We do not believe that two unrelated taxpayers would structure an agreement to pay commissions for services performed around one taxpayer's adoption of the LIFO method of inventory valuation. The Trust had no independent reason to adopt LIFO. Indeed, use of the LIFO method for 1976 without a reduction in commissions resulted in a huge loss to the Trust. Further, the services performed by the Piano Company for which commissions were paid did not decrease when commissions were reduced. *See,* Treas.Reg. § 1.482–2(b)(3). The business justification asserted for the Piano Company's receiving reduced commissions is unpersuasive and unsubstantiated.

■ A determination of deficiencies by the IRS is presumed correct and the taxpayer has the burden of showing it to be

otherwise. *Davis v. Commissioner,* 585 F.2d 807, 812 (6th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). The plaintiff has not carried its burden of proving that the defendant was incorrect in allocating an additional $725,-614 in commission income to it for 1976.

Under the written contract in effect, the Piano Company had a right to commissions determined by reference to the "cost prices" shown on Schedule B. The parties continued to operate under that contract in 1976, with the Trust purchasing inventory at the Schedule B prices, and the Piano Company recording "gross commissions" from collections on sales by dealers. By agreement of the parties, however, the Piano Company received $725,614.89 less in commissions than it was entitled to under the contract.

■ This was tantamount to a waiver of earned commissions by the Piano Company. In a similar but much simpler case on point, the IRS' determination of a deficiency in reported commission income was upheld. In *Mensik v. Commissioner,* 37 T.C. 703, 748 (1962) *aff'd,* 328 F.2d 147 (7th Cir.1964), *cert. denied,* 379 U.S. 827, 85 S.Ct. 55, 13 L.Ed.2d 37 (1964), the taxpayer was entitled to commissions on insurance sales equal to 20% of the initial premiums paid. However, on sales to employees, friends and relatives, 20% was deducted by them before making the premium payment to the taxpayer. The Tax Court held that having earned the premiums he could not escape taxation thereon by voluntarily waiving or assigning his right thereto to someone else, citing *Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930) and *Helvering v. Horst,* 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). The Piano Company's agreeing to accept less commissions than it had earned under the contract, with the attendant reduction in taxable income, does not appear to warrant a different result from *Mensik. See also, Hugh*

---

**3.** While not dispositive of this issue we note that a control relationship in the case of "charitable" organizations which are exempt from federal income tax is established where a majority of

the trustees of one organization are appointed by the trustees of another organization. *See,* Treas.Reg. § 1.509(a)–4(g)(1)(i).

*Smith Inc. v. Commissioner*, 8 T.C. 660, 670–1 (1947) *aff'd*, 173 F.2d 224 (6th Cir. 1949), *cert. denied*, 337 U.S. 918, 69 S.Ct. 1161, 93 L.Ed. 1728 (1949).

We find that plaintiff is not entitled to a refund of taxes and interest paid as a result of the IRS' allocation of an additional $725,614 in income to it for 1976.

## II. Installment Accounts. Receivable Issue

The IRS contends that the purchase by NFU of the defaulted installment contracts was a sham; that in substance, if not form, the contracts were repurchased by the Piano Company. In the alternative the IRS argues that the sole purpose for the purchases by NFU was the evasion of taxes by the Piano Company, therefore requiring an allocation of income to the Piano Company from collection on the contracts under § 482.

We disagree with both theories. The plaintiff has produced sufficient credible evidence to overcome the presumptive correctness of the IRS' determination. *Davis v. Commissioner*, 585 F.2d 807, 812 (6th Cir.1978).

■ The testimony of Mr. Huff, coupled with Plaintiff's Exhibits 3 and 4, establishes that NFU did purchase and pay for the defaulted installment contracts. In turn the Piano Company acted as collection agent for a monthly fee and remitted the collections on the contracts to NFU. The IRS has produced no evidence to support its theory that the Piano Company repurchased the contracts from Continental.

■ The attempt by the Piano Company to avoid being taxed on collections on the contracts after changing from the accrual method to the installment method of accounting is a justifiable business purpose for a bona fide sale of installment accounts receivable. A taxpayer has the legal right "to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits," and the motive of the taxpayer to escape payment of a tax will not alter the result.

*Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). In *City Stores v. Smith*, 154 F.Supp. 348 (E.D.Pa. 1957) the Court held that payments on installment accounts sold by plaintiff to two banks to avoid "double taxation" would not be included in plaintiff's income, overruling the IRS' argument that the sales were not bona fide. The IRS indicated it would follow the result in *City Stores*, that is, a taxpayer electing the installment method need not include in gross income amounts attributable to installment obligations sold in the previous year. *Rev.Rul. 59–343*, 1959–2 C.B. 137.

We need not decide whether Baldwin had the ability to exercise direct or indirect control of NFU for purposes of § 482, because the sale to NFU meets the test of arm's length dealings regardless. The sale of defaulted installment contracts from Continental to NFU was advantageous to Baldwin for both tax reasons and to maintain a good creditor relationship with Continental. From NFU's perspective this was an attractive investment opportunity which produced an excellent rate of return. The Piano Company's reimbursing the interest portion of the contracts to NFU provided the impetus for NFU to make the investment. Defendant's post-trial brief admits that the payments made to NFU were less than the additional tax which would have been owed by Baldwin if it were treated as having repurchased the contracts directly from Continental (Court Doc. 60 at p. 17.)

■ Once the taxpayer meets its burden of proof with the production of competent and relevant credible evidence sufficient to establish that the IRS' determination is erroneous, the burden of going forward with the evidence is shifted. If the IRS offers no evidence to support a deficiency assessment, uncontroverted evidence that the IRS' determination is incorrect will meet the taxpayer's ultimate burden. *Sullivan v. United States*, 618 F.2d 1001, 1008–9 (3rd Cir.1980.)

The IRS here has produced no evidence to support its deficiency assessment. The IRS' assertion that Continental had no

knowledge of or dealings with NFU was not supported by credible or reliable evidence, and was refuted by plaintiff's witnesses.

Based upon the foregoing we find that plaintiff is entitled to a refund from the defendant of $528,611.

### Conclusions of Law

1. This Court has jurisdiction over this action under 28 U.S.C. § 157 as enacted July 10, 1984.

2. Defendant's allocation of an additional $725,614 in commission income to plaintiff for its 1976 tax year was correct, and judgment is hereby rendered in favor of the defendant on the commission issue.

3. Defendant's allocation of an additional $640,195 in income to plaintiff for 1976 attributable to collections on installment accounts receivable was incorrect.

4. Plaintiff is entitled to a refund of $528,611 in taxes and interest it paid attributable to the installment accounts receivable deficiency assessment, and judgment is hereby rendered in favor of the plaintiff on the installment accounts receivable issue.

IT IS SO ORDERED.